## COURT OF APPEALS.

### Oct. 19, 1909.

## THE PEOPLE v. BEDROS HAMPARTJOOMIAN.

### (196 N. Y. 77.)

(1). MURDER—EVIDENCE EXAMINED AND HELD SUFFICIENT TO SUSTAIN CONVICTION.

The evidence, upon the trial of a defendant charged with murder, examined and *held*, that the homicide was clearly proved by undisputed evidence, and all the circumstances, as well as defendant's avowal, showed that it was carefully planned and deliberately executed. The evidence tended strongly to show that defendant knew the nature and quality of the act and that it was wrong, and it is clear that the weight of evidence did not require a finding by the jury that he was insane.

(2). SAME—EXPECTATION THAT GOOD WILL RESULT NO EXCUSE FOR CRIME.

One may not commit a crime because he hopes or expects that good will come of it. Our laws condemn an assassin regardless of his purpose or motive, and the spirit that would aid revolution abroad by murdering peaceable citizens here should meet with stern repression.

(3). TRIAL—JUROR, WHEN NOT DISQUALIFIED BY OPINION.

An opinion does not now disqualify a juror provided he declares on oath that he believes such opinion or impression will not influence his verdict, and that he can render an impartial verdict according to the evidence, where the court is satisfied that he does not entertain such a present opinion or impression as would influence his verdict. It is not essential that the juror should be positive on the subject.

(4). SAME—EVIDENCE—WHEN ERRONEOUS, EXCLUSION OF, CURED BY SUBSEQUENT TESTIMONY.

An error, if one is made in a ruling excluding evidence, is cured when the evidence subsequently given by the witness, with no intervening delay, embraces every detail called for by the question to which objection was made.

(5). APPEAL—UNREASONABLE DELAY BY COUNSEL.

Where the argument of an appeal from a judgment of death is unreasonably delayed, no allowance will be made defendant's counsel unless a satisfactory excuse is presented to the court.

APPEAL from a judgment of the Supreme Court, rendered
November 4, 1907, at a Trial Term for the county of New
York, upon a verdict convicting the defendant of the crime of
murder in the first degree.

The facts, so far as material, are stated in the opinion.

*Harriette M. Johnston-Wood, Emmet J. Murphy* and *Wil-
liam H. Wood* for appellant. The court erred in overruling
defendant's challenge to the juror John E. Howe. (*People v.
Wilmarth,* 156 N. Y. 566; *People v. Flaherty,* 162 N. Y. 532;
*People v. Larubia,* 140 N. Y. 87). It was error to exclude the
testimony of the witness Garabedian as to what he observed
with respect to the defendant's conduct. (*People v. Wood,* 126
N. Y. 249; *People v. Nino,* 149 N. Y. 317; *Cole's Trial,* 7 Abb.
Pr. 321; *State v. Felter,* 25 Iowa, 6; *State v. Kelley,* 27 N. H.
549; *People v. Kormer,* 117 App. Div. 40; 16 Am. & Eng.
Ency. of Law, 614, §§ 5, 10; *People v. Hoch,* 150 N. Y. 291;
*Freeman v. People,* 4 Den. 9).

*William Travers Jerome, District Attorney (Robert C. Tay-
lor* of counsel), for respondent. No error was committed in
accepting the juror Howe. (Abb. Tr. Brief, Crim. Causes
[2d ed.], 258; *People v. Dunn,* 31 App. Div. 19; 157 N. Y.
528; *People v. Decker,* 157 N. Y. 192).

VANN, J.:

On the 31st of October, 1907, the defendant was convicted
of the crime of murder in the first degree upon an indictment
alleging that on the 22nd of July, 1907, in the borough of Man-
hattan, county of New York, he shot and killed Hovhannes
Tavshanjian willfully, feloniously and of his malice afore-
thought. The jury deliberated but twenty-five minutes before
they rendered their verdict. Judgment of death was pro-
nounced on the fourth of November, 1907, and the appeal there-

from, although taken on the fifth of December in the same year, was not argued before us until the seventh of June, 1909. The trial occupied six days, the appeal book contains one hundred and forty-two pages and the briefs of counsel on both sides, twenty-three. So long a delay is a reproach to the administration of justice and no allowance will be made to counsel until a satisfactory excuse is presented to the court.

The case is clear and simple, but pathetic, because the crime was not committed from sordid or selfish motives, apparently, but from a perverted conception of patriotism. The defendant, a native of Armenia, was about twenty-four years of age at the time of the homicide. He is married, but has no children, and his wife, mother and sister are living in Armenia. He has no other near relative. He came to this country in 1901, worked in a factory in Lowell for five years and, moving to Chicago, lived there for more than a year. He can read, but cannot write, although apparently a man of intelligence.

According to the evidence of five eye-witnesses, corroborated to some extent by others who were on the ground right after the tragedy, on Monday, July 22nd, 1907, at about half-past one in the afternoon, the defendant approached the deceased from behind as he was walking on the sidewalk in front of his place of business at No. 33 East Seventeenth street in the city of New York and, without uttering a word, shot him in the back with a revolver and as he plunged forward shot at him again and again. Each of the three shots took effect. One inflicted a superficial wound on the side, another penetrated the aorta, which is the largest artery in the human body, and the third passed through the lower lobe of the left lung. In the opinion of the physician who performed the autopsy either of the latter would have caused death. The order in which the wounds were inflicted did not appear. Mr. Tavshanjian died instantly, without a word or a groan. After firing the shots the defendant ran away and shooting as he ran wounded a by-stander in the knee.

He fired backward and downward as he was running with the apparent intention of frightening the crowd in hot pursuit. He was promptly arrested with the smoking revolver, containing five empty cartridges, in his hand. Several witnesses who observed him carefully immediately after his arrest testified that there was nothing about his appearance or demeanor to attract attention, and that he was perfectly cool and collected, showing no emotion or outward sign of excitement. In a short time he was taken to the station house, where an Armenian witness who did not know him asked him why he killed this man, and he replied that he came purposely from Chicago to kill him. When asked if the deceased was his enemy the defendant said no, but he was an enemy of his nation. When asked if he was crazy at that time he said no, that he was as sensible as the witness who made the inquiry and that he knew what he had done. He also stated that he knew his life was to be taken on account of what he had done, and he wished they would do it right away so that it would be over with, for he did not want to wait any longer. To another witness who asked him why he did this thing, he said he would answer that question at the proper place. The calmness of the defendant attracted the attention of this observer.

A statement was made by the defendant to the representatives of the district attorney in part on the afternoon of the day of the homicide and in part the next morning after he had been informed on each occasion that he need not answer any question unless he wished to, and that whatever he said might be used against him. According to this statement, which was taken by a stenographer, he was " personally a revolutionist." He left Chicago for Worcester, Massachusetts, remained there three weeks, and then came to New York for the purpose of killing Mr. Tavshanjian, whom he regarded as an enemy of his country, because during the year before he had revealed to the Turkish authorities the names of certain Armenians who

were " trying to get independence." The deceased would give
no money for the revolutionary cause, and the defendant think-
ing he was doing good work for his native land took his life,
and in so doing thought he had served his country. His purpose
was not only to kill him, but to kill all the rich Armenians who
did not give money for their country. He had waited for some
revolutionary society to do the killing, and because they did
not he thought he would. He had not personally asked the de-
ceased to give money for the revolutionary cause until the Fri-
day before the Monday on which the homicide took place, but
he knew that others had asked him and had been refused. On
Friday he asked him himself, saying: " Please give some
money to the revolutionists," and the answer was: " I don't
believe in those brigands and I will never give you anything."
The next day he made up his mind to kill Mr. Tavshanjian, be-
cause it would be a lesson to other rich Armenians and induce
them to help the revolutionists. He selected him because he
thought he was the richest of them all. He bought the revolver
and cartridges in Worcester some time before, and took them to
Chicago with him and thence to New York. When asked if he
was ever sick he said no, except once in the old country, when
his eyes were getting shrunk up and he used to have pains in
his head and was " crazy." " After the massacre, any one that
saw those things—that's one reason that a person goes insane."
This was after his mother and sister had been violated by the
Turks and he had been circumcised by them and compelled to
become a Mohammedan. He was once told by his grandfather
that two of his uncles were " crazy." He thought a great deal
about his country, his mother and sister, and about the young
men in Armenia having to leave their wives to the Turks. " I
used to expect," he remarked, " from this rich man to help my
country, so the Turks wouldn't run away with our girls, and
so forth. If you had a country that was under those circum-
stances and the Turks were running away with your sisters,

what would you do?" He did not expect the deceased to give money to him personally, but to send it on to the revolutionists, and that is what he asked him to do. He refused to give the names of his friends in this country who were working for the Armenian cause, or to tell where he spent his time while in New York three or four days just before the homicide or with whom he associated during that period. When asked if he knew it was against the law to kill a man in this country, he answered, " I know it and I knew perfectly well about those laws when I killed him. . . . I will die—my conscience is clear." " I am going to die for my country. Let my sister in my country not forget me, that I could not do any more for them."

The defendant was not sworn as a witness in his own behalf and no expert evidence relating to the question of his sanity was given on either side. Three relatives were called by him as witness, one of whom testified that the defendant in his sleep used to move around all the time and push about with his hands and say lots of things that could not be understood. Some times in his sleep he used to fight with the Turks. Another witness testified that a year and a half before the homicide, as well as on other occasions, he saw the defendant sitting with his head in his hands and when spoken to he gave no answer. The same witness testified on cross-examination that the defendant was a diligent workman and received payment for overtime; that while all Armenians talk about the Turkish massacres, he talked more on that subject than the others, and in fact did not talk about anything else. The third witness testified that the defendant used many times to sit down in a thinking attitude, and when asked what he was doing used to say: " I have to think of my condition and of my country's condition," and then he would get up and go to work again; that he used to say that he thought over the condition of his mother and sister, and that he had to leave his country and

come over here and could not help them in any way, and had no money to do anything for them. No act or saying of his was characterized as irrational by any witness.

During the trial it was announced by the defendant's counsel that there was no contention that the killing was justifiable or excusable, except so far as his mental condition was concerned. No exception was taken to the charge, which was full and fair, and no request was made by either side.

No argument is needed to show that the case was for the jury. The homicide was clearly proved by undisputed evidence, and all the circumstances, as well as the defendant's proud and defiant avowal, showed that it was carefully planned and deliberately executed. The evidence relating to insanity was not strong. Even if the jury could in reason have found the defendant insane at the time of the homicide, it is clear that the weight of evidence did not require it. The claim of the defendant that he acted from patriotic motives and sought only to serve his native country has no bearing except upon the question of his sanity. The atrocious wrongs perpetrated upon him and his in Armenia furnish no legal excuse for his violation of the laws of this country, to which he had fled for safety. When he came here he was bound to obey our laws; and, as he said himself, he knew "perfectly well about those laws" when he shot Mr. Tavshanjian and the penalty for their violation. No one can be permitted to take refuge in this country from wrongs, however great, suffered in his own, and commit murder here in order to serve his native land. As the chief judge recently observed: "One may not commit a crime because he hopes or expects that good will come of it." (*People ex rel. Hegeman v. Corrigan*, 195 N. Y. 1, 13, 23 N. Y. Crim. 242). The defendant did not even kill one who had done him or his kindred any wrong, but one who simply refused aid to his revolutionary purposes. Our laws condemn an assassin, regardless of his purpose or motive, and the spirit that would aid revolution abroad

by murdering peaceable citizens here should meet with stern repression.

Although several witnesses observed him carefully right after the shooting, no one saw anything peculiar about him, his acts or declarations; but on the contrary, he was cool, collected and natural in appearance. Apparently, he was in the full possession of all his faculties. He planned the crime hours before it was committed, approached his victim from behind, fled after he had accomplished his purpose, and when searched a bicycle cap was found in his pocket, with which the jury could have found he intended to disguise himself in case of escape. The evidence tended strongly to show that he knew the nature and quality of the act he was doing and knew that the act was wrong, and we see no reason to disturb the verdict unless some error was committed during the trial of the case. Although not asked by his counsel to review the case upon the merits, we have deemed it our duty to do so, for if we reached the conclusion that the jury made a mistake we should order a new trial on our own motion.

The learned counsel who argued the appeal for the defendant discussed but two questions before us and her brief contains no allusion to any other.

1. It is insisted that the challenge of the defendant to the juror John E. Howe was improperly overruled. The juror was drawn from a panel of " Special Jurors," pursuant to chapter 602 of the Laws of 1901. That act gives the parties the same number of peremptory challenges and the same challenges for cause as upon a trial with an ordinary jury, but, as it further provides, " The rulings of the trial court, however, in admitting or excluding evidence upon the trial of any challenge for actual bias shall not be the subject of exception. Such rulings and the allowance or disallowance of the challenge shall be final." (Section 8).

The defendant used but six of his thirty peremptory challenges.

Mr. Howe, when sworn on his *voir dire*, testified, in substance, that he had never known the deceased and was not acquainted with the counsel on either side; that he had not heard of the case except through the newspapers, and had read them but little and no full account of the matter; that he had not read the papers recently and never with much interest and had conversed with no one about the case; that he had formed no opinion as to the guilt or innocence of the defendant, but had what he called a prejudice derived from the few facts he had gleaned from the newspapers; that he believed he could lay it aside, enter the jury box with an open mind and render a fair and impartial verdict, entirely on the evidence and the charge of the court, but was not positive that he could do so; that he would be guided in all matters by the charge and he would try to prevent, and he believed he could prevent, what he called his prejudice from influencing his verdict. It did not appear whether the so-called prejudice was general or specific, in favor of or against the accused, or against the crime of murder in the abstract. The trial court evidently concluded that the prejudice was but an opinion which would not influence the verdict, and we think he was right. An opinion does not now disqualify a juror provided he declares on oath, as Mr. Howe did, " that he believes such opinion or impression will not influence his verdict, and that he can render an impartial verdict according to the evidence, and the court is satisfied, that he does not entertain such a present opinion or impression as would influence his verdict." (Code Cr. Pro. Sec. 376, Subd. 2). It is sufficient under the statute now in force if the juror believes that his opinion will not influence his verdict, etc., and it is not essential that he should be positive on the subject. Aside from the technical answers, we think no error was committed by the court.

in overruling the challenge to this juror, even when it is considered on the merits.

2. It is further claimed that it was error to exclude the testimony of the witness Garabedian as to what he observed with respect to the defendant's conduct.

This witness testified that he was twenty-five years of age and a cousin of the defendant; that he saw the defendant in the year 1895, and remembered a time in that year when he came to his house and they had a conversation. He was then asked what the defendant said to him and the district attorney objected upon the ground that enough foundation had not been laid at the present time for a conversation had twelve years ago. He added that it might be proper at some stage of the case, but was not proper at this stage. The court sustained the objection and no exception was taken. The witness further testified that after the defendant came to America he used to see him frequently and that they slept together five years ago. He was then asked what, if any thing, he observed with respect to whether he slept well or not. Objection was made on the ground that it was incompetent and immaterial whether the defendant five years ago slept well. The objection was sustained and the defendant excepted. This witness was also asked what, if any thing, he observed in the defendant's conduct that attracted his attention. This was excluded as too indefinite and too remote, and an exception was taken. Afterward the witness was allowed to state whatever he observed about the defendant at any time, when he was asleep or awake, what he did and what he said, and everything that could have any bearing on his mental condition.

As the evidence subsequently given by the witness, with no intervening delay, embraced all that the questions objected to called for, including every detail, the error, if any, was cured. This is too obvious to require discussion.

While these are the only rulings that we were asked to consider, still, in accordance with our custom in capital cases, we have carefully examined all the others, whether excepted to or not, and we find none of which defendant has a legal right to complain.

I recommend that the judgment be affirmed.

CULLEN, Ch. J., EDWARD T. BARTLETT, HAIGHT and CHASE, JJ., concur; GRAY and WILLARD BARTLETT, JJ., absent.

Judgment of conviction affirmed.