Wachtler, J.
This is an appeal from judgments of the County Court of Ulster County based on jury verdicts convicting the appellants of felony murder and sentencing both of them to death. Since this is a case in which the death penalty was *95 imposed, the appeal came directly to our court from the County Court (CPL 450.70).
In view of our recent decision in People v. Fitzpatrick (32 N Y 2d 499), declaring this State’s death penalty statute unconstitutional, we should — as a minimum — remand this case for resentencing. The appellants, however, raise several issues which they claim require reversal of the conviction and a new trial, one of which — relating to the court’s refusal to excuse four prospective jurors for cause — has substantial merit.
The facts underlying the appellants’ conviction are relatively brief. On September 13,1968 three prisoners, Culhane, Bower-man, and McGivern were being taken by auto from the Auburn State Prison to White Plains in connection with a coram nobis hearing on behalf of Culhane. The two escorting Deputy Sheriffs were riding in the front seat of the car. The ear was Deputy Sheriff Fitzgerald’s personal car so there was no screen separating the prisoners from the two Deputy Sheriffs, Singer and Fitzgerald, who were riding in the front seat. Each deputy carried a .38 caliber revolver at his side.
Prisoners Culhane and McGivern were handcuffed to a loop in front of their security belt. Each belt buckled in the back. Prisoner Bowerman’s belt was fastened in the front with a chain and a hasp to which the handcuffs were attached. None of the belts were attached to each other. At the time of the incident in question, Culhane was sitting behind the driver, McGivern was in the middle and Bowerman was on the right, behind the passenger side of the front seat.
They never reached White Plains, for the trip ended in violence in Ulster County, during the course of which the appellants were wounded and the prisoner Bowerman and Deputy Sheriff Fitzgerald were killed.
Appellants were charged with felony murder for killing the Deputy Sheriff during an attempted escape (Penal Law, § 125.25, subd. 3). At the trial the People relied on both circumstantial evidence and the eyewitness testimony of Deputy Singer to prove their case. Singer’s testimony, which was inconsistent as to certain particulars, was used to show that Bowerman and Culhane “ jumped ” the deputies from behind using their handcuffs to choke them while McGivern seized one of the Sheriffs’ *96 revolvers and killed Fitzgerald.[1] Evidence was also submitted demonstrating that Bowerman’s belt had been cut on the left side; appellants’ belts had been unbuckled; and that a search of the prisoners’ clothes revealed that Bowerman possessed a handmade handcuff key, and Culhane, a razor blade.
Defendants ’ theory was that only the deceased prisoner, Bowerman, had attempted to escape.
The incident and the subsequent legal proceedings — which constituted the first time the death penalty was to be considered by a jury in the history of Ulster County — received considerable exposure in the local media. Prior to trial the appellants moved for a change of venue, which was denied by the Appellate Division, Third Department, without opinion. After the first trial ended in a hung jury, the appellants renewed their application for a change of venue which was once again denied without opinion. When the appellants were found guilty at the second trial on February 19, 1971 some two years had elapsed since the time of the occurrence. It is undisputed that during this period the case was frequently discussed on the local radio stations and was the subject of over 50 articles in the local newspaper.
The effect of this extensive and sensational news coverage was reflected during the voir dire of the prospective jurors conducted during this second trial. The record shows that 86 of the 106 veniremen questioned had some knowledge of the case and that several of them had formed opinions as to the appellants’ gui . It also became apparent during the voir dire that a number of the prospective jurors were correction or peace officers, as were the victim and chief prosecution witness.
These circumstances gave rise to numerous challenges for cause. In the case of four veniremen (Conger, Cady, Davis and Kris el) it is conceded by the District Attorney the court refused to allow the appellants ’ challenge and it is claimed that this was error.
*97 The propriety of these rulings raises the crucial issue on this appeal. If the contention is sustained, the appellants are entitled to a reversal and a new trial. Although the veniremen did not sit on the jury, because the defendants exercised peremptory challenges, this is of no consequence. It is well settled that an erroneous ruling by the court, denying a challenge for cause, constitutes reversible error when the defendant peremptorily challenges the prospective juror and his peremptory challenges are exhausted before the jury selection process is complete (People v. Casey, 96 N. Y. 115,123; People v. Flaherty, 162 N. Y. 532, 537, 538). This rule of long standing, derived from the common law, has recently been codified in CPL 270.20 (subd. 2). Here of course the defendants’ peremptory challenges were exhausted before the jury selection was complete. In fact they exercised their last challenge on venireman Bichard Krisel.
Culhane urges that all four of the veniremen should have been excused for cause, while McGivern relies only on the court’s refusal to excuse Davis and Krisel (both of whom were correction officers) as ground for reversal.
The voir dire of these veniremen disclosed the following: Conger stated he had “ read the newspaper accounts from the last trial ” and “ heard them on the radio, too ” almost on a daily basis. When asked whether this had left any impression as to the guilt or innocence of the defendants he stated, “ I think you would have to prove to me they were innocent ”. After he was advised that it was the People who bore the burden of proof he replied, “ If you really want a frank answer, all I can say is a car is a pretty small vehicle, and it is pretty hard from what I know — you are going to have to show self-defense. I don’t know whether you are going to do it or not, but I just made those conclusions from the last newspaper articles ”. However he denied that he had already decided the case. “ I haven’t decided it, Tour Honor. I know you are going to charge the jury, and if I was on it, I would give you a verdict within those perimeters you set up. I haven’t decided it, no.”
He then acknowledged that he would follow the court’s instructions and find the defendants not guilty if the People failed to prove their case. However, on cross-examination he once again stated his opinion of the defendants’ guilt. “ Well, from what I read in the paper last time, I would feel they probably were *98 guilty of what they were charged with in the first case. "Whether they were guilty according to the Judge’s charge, I don’t know. Now, the Judge asked me if I could give a verdict within the perimeters he sets up, and! said yes, I could.”
The second of the veniremen, Ernest Cady, stated that he had read newspaper accounts of the case and “ heard some discussions ” but did not “ have very many facts ” or any “ fixed impression ”. However, when asked whether he had an opinion as to whether or not the prisoners had tried to escape, he stated, “ I think they tried to escape ”. But he felt that he could put aside this opinion “ If I hear the facts ”. When queried on this point again he repeated that he could put this opinion aside and judge the case solely upon the evidence “ if I hear the testimony ’ ’ and that he could swear an oath that his previous opinion would not influence his verdict.
The third of the veniremen, William Davis, stated that he had been a corrections officer for 15 years and was presently employed at a correctional institution (Napanoch). He admitted having read about the case in the newspapers, but denied having formed any opinion as to the guilt or innocence of the defendants. However, he did express feelings about the ability of prisoners to tell the truth. He stated that ‘ ‘ They don’t always ” but indicated that if they testified under oath, he would not feel that way. (“ No, I don’t think so.”) When asked whether he could believe a man with the defendants’ background who “ was accused of strangling a deputy sheriff and attempting to escape ” he admitted that it was “ a rather difficult question ”. He would not, he stated, reject the testimony merely because of their background, “ Not altogether. I mean it demands weighing, balancing ”. Defense counsel then asked Davis whether he could believe Culhane if he testified that he was coerced by another prisoner to cut the safety belt with a razor blade later found in Culhane’s clothing, or would this testimony be rejected merely because of Culhane’s prison record. Davis stated, “ In view of what has taken place, if he’s carrying a razor blade, he couldn’t hardly make a statement that he hadn’t intended to do otherwise, in my honest opinion ”. The court then asked him if he understood that he could take the defendant’s criminal background into consideration as long as he did not automatically reject the testimony because of his criminal record. *99 Davis answered, “Yes, but now, in view of what you have told me, how much can you believe? ” He also revealed on cross-examination that he had, in connection with his duties, cited prisoners for minor infractions which resulted in a “ regular little court hearing ” and that his superiors had only rejected what he said, as against these prisoners, “ possibly twice ” during the course of his 15 years’ service.
Finally there was the testimony of the venireman Richard Krisel who was also a corrections oEcer. He had been employed at Sing Sing and was assigned at the time of trial to Woodbourne Rehabilitation Center, where he was an oEcial (Chief Steward) of the Correction OEcers’ Union. Since his testimony was in many respects similar to that given by the other three veniremen it serves as a useful summary and illustration of the various factors relevant to the determination of this appeal. Accordingly much of Krisel’s testimony has been quoted below:
By-the Court:
Q. Do you feel that with your background as a correction and now rehabilitation officer it would affect your decision in this case in any way?
A. No.
Q. Do you know anything about this ease?
A. Just a little bit that I have read.
Q. Have you formed an opinion about it?
A. Yes.
Q. Do you feel you could set aside that opinion and decide this case on the facts as they are developed during the course of the trial?
A. I would go by the facts only.
Q. I hope so. But you have an opinion now.
A. Right.
Q. Whatever that opinion might be. And if the facts as they are developed, and you are going to go by them, could you set aside that present opinion and decide the case solely on the facts, fairly?
A. No.
Q. Couldn’t set aside that opinion?
A. No. Because I have réad about the case and —
Q. In other words, you read about the case and you feel that factual.
A. I have formed an opinion already.
# *
By Mr. Kerr [for the People]:
Q. I didn’t hear what your last, the last question and the last answer was. But was it to the effect that you have an opinion on this case ?
A. I might have formed an opinion just through reading newspapers.
Q. You understand that the newspapers are not always correct.
A. Definitely.
*100 Q. You realize that eases aren’t tried in the newspaper and newspapers are not always noted for being exactly correct and accurate.
A. True.
Q. And complete in their reporting. Do you feel that if we spend a week or ten days, whatever it may be, bringing in evidence in this case, that you could take a look at that evidence rather than what you read in the newspaper?
A. Definitely.
Q. Do you think you could put out of your mind anything that you have read in the newspaper and judge this ease based on the evidence that we bring in?
A. I think I could.
Q. If the Court tells you it is your sworn duty to do that,—
A. Right.
Q.— do you feel you could do it?
A. Yes.
Q. And you would do it?
A. Right.
# # #
By Mr. Koplovitz [for the defendant McGivern] :
Q. Mr. Krisel, what is your opinion at the present time as to whether the defendants in this case are guilty of the crime charged?
A. Just by what I have read in the newspapers.
Q. You have an opinion; right? I’d like to know what that opinion is.
A. Technically, I really don't have an opinion. I haven’t studied the newspaper reports accurately. You know, I haven’t really kept up with it. Just one I day I read in the newspaper, and that is about it; but I haven’t really formed I any opinion. I
# & # I
Q. Now, the newspaper reports stated that the prisoners attempted to escape; I is that your recollection? I
A. Yes. I
6 « # I
Q. you do recall that the newspaper said that the sheriff was shot during the I course of an attempted escape by the three prisoners. I
A. Right. I
Q. And I am asking you now whether you have an opinion as to whether or I not the prisoners were attempting to escape or not? I
A. Well, I would have an opinion they were attempting to escape. That’s my I
opinion. I
# # # H
Q. Now, given the fact that you have this opinion, that they were trying to I escape, you would I suppose require some showing from them — ■
A. True. I
Q. —to overcome— I
A. Right, that opinion. I
*101 Q. —this opinion. Is it also fair to say that you are not sure as to whether or not this opinion that you have might influence you in determining their guilt or innocence?
A. True.
Mr. Koplovitz: Challenge for cause.
By the Court:
Q. Let me ask you this question now: You have an opinion now, but can you set aside that opinion and listen to the evidence and decide this case upon the evidence, impartially?
A. I would on evidence, definitely.
Q. You say you can set aside that opinion?
A. Yes.
Q. And that opinion will not in any way affect your verdict?
A. I don’t think so, no.
The Court: Denied.
By Mr. Koplovitz:
Q. Mr. Krisel, can you swear under oath that this opinion that you have under no circumstances will affect your verdict?
A. I'd swear under oath, yes.
Q. Would that be truthful? Would that be the truth?
A. It would be truthful.
Q. And yet you just said a few moments ago that given your opinion that the defendants were attempting to escape, you would require some proof that they were not.
A. Either way I would require proof. Either way.
Q. But didn’t you say a few minutes ago that you would require some proof that they were not attempting to escape, to overcome this opinion?
A. True.
Q. So this opinion is with you, you have got this opinion and you are not —
Mr. Kerr: I object to further pursuing this, Your Honor. He already said he could put any opinion aside.
The Court: He said both things. This is the problem. To me he says “Yes to Mr. Koplovitz he says, “ No ”.
* * #
By Mr. Vladimir [for defendant Culhane]:
Q. If the main witness for the People’s ease is a police officer, deputy sheriff, would you tend to believe him more than somebody else?
A. I would tend to believe him, yes.
Q. Do you think that it is possible he could lie under oath?
A. I don’t think so. I don’t think he would lie.
Q. No matter what the answers were that he gave, you would say that they were honest, would you?
A. He’s sworn under oath.
Q. He’s sworn under oath.
A. I would say he’d tell the truth.
*102 By the Court:
Q. Did you ever hear of police perjury?
A. Yes.
Q. You mean to say that if after hearing this police officer testify, and using your background, your experience, your common sense, you come to the conclusion that he is not telling the truth, would you still believe him?
A. If I come to the conclusion, no, I wouldn’t believe him.
. At common law, any venireman who had formed or expressed an opinion of the defendant’s guilt or had otherwise demonstrated that he was “ not indifferent between the parties ” was “as a rule of law, disqualified ”. (See Greenfield v. People, 74 N. Y. 277, and the cases cited at p. 281.) There is little doubt that if the defendants had been tried under common law the court’s refusal to excuse these four veniremen for cause would have constituted reversible error.
The statute in effect at the time of the trial (Code Grim. Pro., § 376) however, contained a modified version of the ancient rule. In essence it codified and severely limited the grounds for automatic disqualification and provided that in all other cases the veniremen’s “ actual bias ” could be purged by the recitation of a statutory oath provided the court in its sound discretion was satisfied that the oath had dispelled the taint. (People v. Genovese, 10 N Y 2d 478, 481-482; see, also, People v. Lubin, 190 App. Div. 339,340, affd. 299 N. Y. 601; People v. Hampartjoonian, 196 N. Y. 77, 85; People v. McGonegal, 136 N. Y. 62, 69; People v. Casey, 96 N. Y. 115,118-119.) This statute (Code Crim. Pro., § 376) read as follows:
“ Particular causes of challenge are of two kinds:
“ 1. For such a bias, as, when the existence of the facts is ascertained, does in judgment of law disqualify the juror, and which is known in this Code as implied bias;
66 2. For the existence of a state of mind on the part of the juror, in reference to the case, or to either party, which satisfies the court, in the exercise of a sound discretion, that such juror cannot try the issue impartially and without prejudice to the substantial rights of the party challenging, and which is known in this Code as actual bias. But the previous expression or formation of an opinion or impression in reference to the guilt or innocence of the defendant, or a present opinion or impression in reference thereto, is not a sufficient ground of challenge *103 for actual bias, to any person otherwise legally qualified, if he declare on oath, that he believes that such opinion or impression will not influence his verdict, and that he can render an impartial verdict according to the evidence, and the court is satisfied, that he does not entertain such a present opinion or impression as would influence his verdict.”
Our primary concern in this appeal is with operation, of subdivision 2 and with the concepts of “ actual bias ” and the more technical requirements of the expurgatory oath. But since the appellants seem to suggest that Officers Davis and Krisel should have been automatically disqualified because of their occupation as correction officers, subdivision 1, providing for this type of disqualification deserves some comment.
Actually the grounds for disqualification as a matter of law were found in section 377 of the Code of Criminal Procedure and were limited to certain enumerated relationships. To be sure some of these disqualifying relationships — such as consanguinity or affinity within the ninth degree or having been the adverse party (to the defendant) in a civil action — carry with them no more potential bias than does the situation now under consideration. There is a compelling logic to the appellants’ contention that “ where a peace officer has been killed and a peace officer is the principal prosecution witness, no other peace officer should be allowed to sit in judgment For even if the officers called as jurors were in fact impartial that would not dispel the lingering appearance of justice denied. Surely the prospect of a jury composed, in whole or in part, of correction officers would present a nightmarish specter to these two convicts on trial for their lives. Conversely if Officers Davis and Krisel were being brought up on charges of having brutalized prisoners, they would not want members of the Fortune Society to be the fact finders in the case.
Other jurisdictions which have recognized a broader spectrum of disqualifying relationships have held under similar circumstances that such veniremen should be excused for cause. (See, e.g., Commonwealth v. Colon, 223 Pa. Super. Ct, 202, 205-208 — police commissioner not qualified as a juror to sit on case involving shooting of a police officer; Sims v. United States, 405 F. 2d 1381, 1384, n. 5 — juror related to taxi driver in case involving murder of a taxi driver; United States ex rel. DeVita *104 v. McCorkle, 248 F. 2d 1, cert. den. 355 U. S. 873 — juror recently-robbed cannot sit in robbery case; see, also, United States ex rel. Fletcher v. Cavell, 287 F. 2d 792; Jackson v. United States, 395 F. 2d 615; Durham v. State, 182 Tenn. 577.)
However, under the Code of Criminal Procedure, in effect at the time of this trial, there was no specific or general provision which would apply to the relationship that existed between Officers Davis and Krisel, the victim, the prosecution witness and the defendants. The list contained in section 377 of the Code of Criminal Procedure was clearly meant to be exclusive since the statute provided that “ A challenge for implied bias may be taken for all or any of the following causes, and for no other ” (emphasis added).[2] But the matter does not stop here, for as we indicated in People v. Fernandes (301 N. Y. 302, 318-321) a showing of implied bias not fully contemplated by sub *105 division 1 (Code Crim. Pro., § 376) does not preclude a challenge for cause under subdivision 2 of that section if the circumstances indicate that the venireman “ cannot try the issue impartially and without prejudice to the substantial rights of the party challenging ”.
This “ status plus ” approach seems to be the ineffable thesis underlying the Appellate Division’s decision in People v. Oddy (16 A D 2d 585). That case involved the trial of men who had allegedly killed a prison guard. An alternate juror who eventually replaced a regular juror had been a Deputy Sheriff and a prison guard for 39 years. During the voir dire, the juror in question had stated that “ the evidence would have to be very strong ” to overcome the bias he had. But he later stated he would go by the evidence, and he even took the expurgatory oath as required by section 376 (subd. 2) of the old Code of Criminal Procedure. Nevertheless, the appellate court held it was reversible error not to dismiss this juror for cause since it was clear that it would be “ difficult, if not impossible ” to “ fight detachment from his past ”.
It is evident in the case at bar that each of the four challenged veniremen displayed some degree of “ actual bias ” establishing prima facie ground for disqualification under subdivision 2 of section 376 of the Code of Criminal Procedure.
Officer Davis, of course, never stated “ in haec verba ” that he had formed an opinion as to whether or not the defendants had attempted to escape, although he did express his “ honest opinion ” that he would be unable to believe Culhane if that defendant made “ a statement that he hadn’t intended to do otherwise ”. Davis also made it quite clear throughout the voir dire that he would give less credence to the defendants’ testimony because of their status as prisoners, although he would not necessarily disregard it altogether. This attitude undoubtedly reflected his background and experience as a corrections officer in which his relationship with prisoners had often been an adversarial one. Quite obviously he demonstrated a state of mind in reference to both the case and the parties indicating that he “ cannot try the issue impartially and without prejudice to the substantial rights of the party challenging ” (Code Crim. Pro., § 376, subd. 2; see, also, People v. Fernandez, 301 N. Y. 302, supra).
*106 As to the other veniremen (Cody, Conger and Krisel) they frankly stated that they had read or heard about the case and openly admitted that they had formed an opinion as to the defendants’ guilt. While these opinions varied in degree from a persistent belief that the defendants should have to prove that they were innocent (Conger) or that they did not attempt an escape (Krisel), to a more lightly held opinion that they had tried to (Cody), this was nevertheless a prima facie showing of actual bias. We made this quite clear in People v. McQuade (110 N. Y. 284), when we stated (at p. 301): “ Now as formerly, an existing opinion by a person called as a juror, of the guilt or innocence of a defendant charged with crime, is prima facie a disqualification, but it is not now as before a conclusive objection, provided the juror makes the declaration specified, and the court, as judge of the fact, is satisfied that such opinion will not influence his action.”
We turn then to the expurgatory oath, both generally and as it specifically relates to this case.
Since the statute authorizing the expurgatory oath is in derogation of the common law and touches the vital constitutional right to trial before an impartial jury, we have generally applied a rule of strict construction when called upon to decide whether the statutory requirements have been fully met. Thus, although we have held that ££ [i]t is not necessary that the juror * * * should swear in the very words of the statute ’ ’ (People v. Martell, 138 N. Y. 595, 600), we have consistently demanded a strict adherence to the substance of the statute. “ That is an absolute prerequisite ” (People v. Casey, 96 N. Y. 115, 122). For the most part we have refused to accept variations on the legislative scheme for fear that the statute would be ££ frittered away by a recognition on the part of the courts of loose or ill-considered substitutes as equivalents ” (People v. Wilmarth, 156 N. Y. 566, 569; see, also, People v. Miller, 81 App. Div. 255, 256).
In Wilmarth we noted that the statute calls for the venireman to declare under oath his belief upon two subjects: 11 First, whether the opinion or impression which the juror has will influence his verdict; and, second, whether he can render an impartial verdict according to the evidence.” (People v. Wilmarth, supra, at p. 569.)
*107 Naturally if the oath does not include both of these elements, the requirements of the statute have not been met and the venireman must be disqualified (People v. Wilmarth, supra, at pp. 568, 569; People v. Casey, supra, at p. 124; People v. Flaherty, 162 N. Y. 532, 536, 537).
It is also clear that the belief must be expressed. It will not be implied or assumed, for instance, that the venireman has in fact decided that his prior opinion will not influence his verdict, even though he has sworn that he will “ divest [himself] of any opinion [he] entertain[s] ” (People v. Flaherty, supra, at p. 537) or declares that he can decide the case on the evidence “ notwithstanding ” his prior opinion (People v. Casey, supra, at p. 124; People v. Flaherty, supra, at pp. 536, 537) or 11 in spite of ” his prior opinion (People v. Wilmarth, supra, at p. 568).
But in one respect the context of the oath is quite material. “ [T]he declaration must be unequivocal ” (People v. McQuade, supra, at p. 301). If after taking the oath, the prospective juror makes additional statements “ materially impeaching such declarations ”, the oath is ineffective (People v. Casey, supra, at p. 123; accord Sheppard v. Maxwell, 384 U. S. 333, 351; Irvin v. Dowd, 366 U. S. 717, 727). To this extent the testimony must be taken as a whole. “ It is not enough to be able to point to detached language which, alone considered, would seem to meet the statute requirement, if, on construing the whole declaration together, it is apparent that the juror is not able to express an absolute belief that his opinion will not influence his verdict * * * The defendant [is] at least entitled to a certain and unequivocal declaration of their belief that they could decide the case uninfluenced by their previous opinions ’ ’. (People v. McQuade, supra, at p. 301.) Finally the venireman’s commitment must be expressed in the form of a belief. It is wholly inadequate if he merely acknowledges a duty to decide the case impartially without being influenced by his prior opinion (People v. Wilmarth, supra, p. 569).
If the oath meets these standards it is for the trial court to determine whether the prior opinion or impression has lost its sway over the mind of the juror. “ But if he [the juror] fails to make such a declaration, then the disqualification prima facie *108 established by his answers is not overborne, and a decision by the trial court, that the juror does not entertain such a present opinion or impression as will influence his verdict, is without evidence to support it ” (People v. Wilmarth, supra, p. 568).[3]
As to the individual veniremen in the case now before the court, it is clear that no oath was made by any of them in compliance with the statute.
Venireman Davis, the corrections officer who found it “ rather difficult ” to believe prisoners or to accept the possibility that the defendants had not attempted to escape, was never given an oath whatsoever, either in whole or in part.
The same is true of the venireman Conger, who persistently said that he felt the defendants would have to show self-defense. Although he stated twice that he would follow the court’s charge and “ give you a verdict within those perimeters ” and would give everybody a “ fair shake ”, these were the only statements he made suggesting that he would be able to hear the case with an impartial attitude. These declarations obviously fell far short of the statutory requirements. Although it is arguable that the ‘[1] fair shake ’ ’ statement could be considered a declaration of impartiality, it is clear that the second part of the oath was never supplied for this venireman never stated his belief that the opinion he had formed would not influence his verdict. Of course the general promise to perform his duty and follow the Judge’s charge is not an acceptable substitute for the declarations specified in the statute (People v. Wilmarth, supra, at pp. 568, 569).
The bias demonstrated by Ernest Cady was not so manifest that the oath would have been insufficient to overcome it. Although he admitted that he thought the defendants had tried to escape, he stated that this opinion would not influence his *109 verdict and that he could render a verdict based solely upon what transpired at the trial. But once again the oath was only partly taken for the venireman never swore that he could reach an impartial verdict.
It is only in the case of George Krisel that both parts of the oath were administered during the course of the voir dire. The problem here, however, is that after taking the oath, Krisel made statements “ materially impeaching such declarations ” (People v. Casey, supra, at p. 123).
After stating that he had an opinion which he could not put aside, he agreed to do so but only because of his “ sworn duty He then proceeded to deny that he had ever formed an opinion of the case but admitted that he just stated otherwise. At this point he became confused as to whether he even had an opinion and finally admitted that he still had an opinion but only as to the escape attempt, which would require proof to the contrary. He expressed doubt as to whether this opinion would influence his verdict but then after being questioned by the court agreed that he could set aside this opinion and did not think it would influence his verdict. But after making this declaration he repeated his earlier testimony that he had an opinion as to the escape which would require some proof from the defendants. This was followed by another statement that he could put aside this impression provided there was some proof explaining away his opinion as to the escape attempt. His final statement on this point was that he would put aside this opinion because of his sworn duty.
His statement of impartiality, made early in the voir dire was later belied and contradicted by his admission that he would tend to believe the prosecution’s witness because he was a Deputy Sheriff, and would not consider it possible that he would lie under oath.
Obviously Krisel’s testimony taken as a whole, and fairly considered, reveals that the oath was not taken “ unequivocally ” (People v. McQuade, supra, at p. 301) and “ without reservation ” (People v. Genovese, 10 N Y 2d 478, 483, supra). Surely we would be giving a new and perverse meaning to those terms if we were to hold otherwise.
Since we have concluded that the oaths were invalid under the statute it is unnecessary to determine whether the oaths, *110 had they been taken properly, would have been sufficient to erase the taint flowing from the newspaper and radio publicity. (Cf. Irvin v, Dowd, 366 U. S. 717, supra.)
It should be noted that as with so many other cases, the problem encountered with jury selection is inextricably linked to the problem of venue. (See, e.g., Sheppard v. Maxwell, 384 U. S. 333, supra; Estes v. Texas, 381 U. S. 532.) The media saturation in and of itself is somewhat prejudicial since: “ The prejudice to the defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecution’s evidence.” (Marshall v. United States, 360 U. S. 310, 312-313; see, also, Irvin v. Dowd, 366 U. S. 717, 729, supra [Frankfurter, J., concurring].) No matter how desirable it may be, it is unrealistic to expect and require jurors to be totally ignorant prior to trial of the facts and issues in certain cases (Irvin v. Dowd, 366 U. S. 717, 722, supra; People v. Genovese, 10 N Y 2d 478, 481, supra). Nevertheless, given the very localized and incessant nature of the prejudicial publicity surrounding this case, it probably would have been advisable and fairly easy to avoid this problem by transferring the case to a nearby venue in the first instance. The same course may be the most practical one to take in connection with the new trial.[4]
Although the venue problem is a troublesome one, it is the issue concerning the selection of the prospective jurors which has led this court to the conclusion that the judgments of conviction should be reversed- and a new trial ordered.

. Since we have concluded that there must be a new trial, it would be inappropriate to explore in detail the merits or weaknesses of the People’s case. For the purposes of this appeal we need only note that the prosecutor’s evidence — taken in the context of this particular trial — presented substantial questions of credibility for the jury’s consideration. This places in bold relief the issue concerning the propriety of the jury selection process.

. The new Criminal Procedure Law section relating to challenges for cause (CPL 270.20) is of interest. Although it is not determinative of the case now before the court, we have on occasion gone beyond the exigencies of the case, to note the effect of recent legislation, particularly where it relates to an already bothersome area of the law. (See, e.g., People v. Beaudet, 32 N Y 2d 371, 378, per Breitel, J.) For the most part this section restates the prior law (see Denzer, J., Practice Commentary, McKinney’s Cons. Laws of N. Y., Book 11A, Criminal Procedure Law, 270.20) but there are certain alterations which are of some significance here.
First it should be noted that, although the new section has carried forward most of the enumerated disqualifying status categories found in the prior law, the list is no longer confined to specifically enumerated relationships. CPL 270.20 (subd. 1, par. [c]) now specifically provides that a challenge for cause may be made on the broader ground that the prospective juror “ bears some other relationship to any such person [i.e., to the defendant, or to the victim of the crime charged or to a prospective witness at the trial] of such nature that it is likely to preclude him from rendering an impartial verdict ” (emphasis and portion in brackets added).
Secondly the talismatic expurgatory oath has been abandoned, so that there is no longer any facile method for purging a prima facie showing of bias. Finally the statute is silent as to whether proof of the relationship constitutes an automatic disqualification of the prospective juror.
In Sum the new law gives the Trial Judge greater flexibility and a greater responsibility in determining which veniremen should be excused for cause. Thus it is apparent that the Legislature has now adopted the more flexible approach evident in the Sims and Colon eases {supra) under which it has been held that veniremen bearing relationships similar to those present in the case at bar should be disqualified for cause.

. It is almost always wise for a trial court to err on the side of disqualification except in eases where disqualifying a certain class of jurors on status grounds (i.e., implied bias) would ipso facto result in creating a strong jury bias in the other direction. (See, e.g., Witherspoon v. Illinois, 391 U. S. 510.) Even if a juror is wrongly but not arbitrarily excused, the worst the court will have done in most cases is to have replaced one impartial juror with another impartial juror. On the other hand, to deny discharge for cause of an obviously biased juror as was done in this case, does more than prejudice the party against whom the bias runs. It easts a doubt on the legitimacy of the verdict even before the trial begins.

. Quite apart from the constitutional issue, is the possibility that upon a new trial we may experience a recurrence of the events we have considered here. To be sure, the court would encounter the publicity attending the second trial and perhaps even the appeal. If this once again results in a protracted jury selection process, there will most certainly be some temptation to relax the rules and accept a doubtful juror so that the case may proceed to trial. Actually the court's responsibility lies in the other direction, requiring a special vigilance to insure that the adverse publicity does not infect the adjudicating process. If, as a result of this vigilance, disqualifications for cause become legion, and make the voir dire a hopelessly burdensome and futile process, that is an indication that venue should be changed.