# State of New York Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 41
The People &c.,
     Respondent,
    v.
Kenneth E. Fisher,
     Appellant.

Lisa A. Burgess, for appellant.
John D. Kelley, for respondent.

WILSON, Chief Judge.:

Upon a jury verdict, the trial court convicted Kenneth Fisher of three counts of third-degree criminal possession of a controlled substance (PL 220.16) arising from two

- 1 -

controlled buy operations.  He was sentenced to nine years in prison. One of the jurors in Mr. Fisher's case was certain that Mr. Fisher had followed her home after the first day of jury selection, a belief the trial court deemed likely unfounded. Instead of promptly informing the court of her concern, she instead waited three days, until the case was submitted to the jury, and then expressed her safety concern to the other jurors as they deliberated.  Those facts established that the juror was "grossly unqualified" pursuant to CPL 270.35, because it was clear she "possesse[d] a state of mind which would prevent the rendering of an impartial verdict" (*People v Buford*, 69 NY2d 290, 298 [1987]). Although the trial judge then elicited some assurances that the juror could put aside her concerns, those assurances were insufficient to support a conclusion that the juror should be retained. Therefore, the juror should have been dismissed and a mistrial granted.[1]

I.

During jury deliberations, the court received a note stating: "Confidential, one juror feels she may have been followed home Monday by Mr. Fisher." On investigation, the juror in question was identified as Juror Six. The court questioned Juror Six in the robing room as follows:

---

[1] The alternate jurors had been dismissed by that point, so a mistrial was the only option available to the court.  Of course, had the juror disclosed her concern prior to the start of deliberations, that would not have been the case (*see* CPL 270.35 [1]).

"THE COURT: . . . The foreperson had indicated in a note to us that you had felt that Monday, after jury selection, that you may have been followed home by Mr. Fisher?

JUROR SIX:  Yes.

THE COURT:  What leads you to believe that?

JUROR SIX:  Because I could see him in my rearview mirror.

THE COURT:  Do you recall what type of car he may have been driving?

JUROR SIX:  It was a maroon Lincoln. I could see the Lincoln symbol, an older model.

…

THE COURT:  And do you recall that this maroon Lincoln, do you recall how many people were in it, or the ages, or—

JUROR SIX:  No, just the driver.

THE COURT:  Okay. Were you able to see that this car was directly behind you, or was it a couple of spots behind you, or—

JUROR SIX:  It may have been six or eight car lengths behind me.

THE COURT:  Okay, and you believe—you think it's Mr. Fisher?

JUROR SIX:  I believe it may have been.

THE COURT:  Can you tell us why you think you may believe that? And I don't mean to impose, but these are just questions that we need to ask you.

JUROR SIX:  I just tend to look in my rearview mirror a lot, because years ago I was rear-ended by an ex-husband.

THE COURT:  Okay. So this was about six to eight cars behind you?

JUROR SIX:  Yes.

THE COURT:  Can you give us with any percentage degree how certain you think that it may have been Mr. Fisher?

JUROR SIX:  95 percent.

THE COURT:  Okay. Is there a reason why you are bringing this up to us now, rather than let's say when we reconvened on Wednesday morning?

JUROR SIX:  Because other juror members were scared for their own safety, because of certain people that were sitting watching the trial through the week.

THE COURT:  Okay. And without getting into what other—those concerns may be, does this affect your ability to remain on the jury?

JUROR SIX:  No.

THE COURT:  Could you be a fair and impartial juror?

JUROR SIX: I can be a fair and impartial juror, yes. I say that, because the other juror members encouraged me, because their safety may be at risk.

THE COURT:  Well, you did exactly what you were supposed to do by telling us your concerns. So without confirming whether that was or was not [defendant], and obviously, we don't know that, and we're just listening to you, you could put aside whatever that is?

JUROR SIX:  Yes.

THE COURT:  And determine this case solely on the evidence and the legal instructions that I gave you.

JUROR SIX: Yes."

Further questioning established that Juror Six had seen Mr. Fisher in the parking lot as she left the courthouse but did not see him get into a maroon Lincoln. Therefore, her identification was based only on observations she made by looking in her rearview mirror at a car that was six to eight car lengths behind.

After consulting with his client, Mr. Fisher's attorney moved for a mistrial on the basis that he did not have a fair and impartial jury. He argued that Juror Six and likely other jurors had fear and apprehension related to Juror Six being followed and also that jurors were demonstrating implicit racial bias.[2]

The court denied the motion. The court gave two reasons for retaining Juror Six: first, it did not credit that Juror Six was actually followed; second and "even more important," Juror Six indicated that she could remain fair and impartial. The court noted that it had not observed anything in the courtroom that would cause jurors to fear for their safety. Defense counsel then asked for questioning of the other jurors, which occurred.[3] After that questioning, defense counsel made no additional motion. The Appellate Division affirmed (212 AD3d 984 [3d Dept 2023]) and a Judge of this Court granted leave to appeal (39 NY3d 1141 [2023]).

---

[2] The record establishes that Mr. Fisher is African American, but does not indicate the race of any of the jurors, including Juror Six.

[3] Because the issue is whether the trial court properly denied the motion for a mistrial on the evidence before it at the time, the information gained from questioning other jurors has no role in our decision here.

II.

CPL 270.35 states that if after a jury is sworn, "the court finds, from facts unknown at the time of the selection of the jury, that a juror is grossly unqualified to serve in the case…the court must discharge such juror." If no alternate juror is available, the court must declare a mistrial (*see* CPL 270.35; CPL 280.10 [3]).

In applying this statute, we have noted that it safeguards two constitutional rights: "the right to be tried by the jury in whose selection the defendant himself has participated, and the right to an impartial jury" (*People v Rodriguez*, 71 NY2d 214, 218 [1988]; *see* NY Const, art I, §§ 2, 6; US Const 6th, 14th Amends). The right to participate in jury selection is protected by the fact that the "grossly unqualified" standard is higher than the standard for removal of a juror during voir dire (*see People v Kuzdzal*, 31 NY3d 478, 483 [2018]; *Buford*, 69 NY2d at 297-298). A juror may be challenged for cause during voir dire if it is "likely" her state of mind will prevent an impartial verdict (CPL 270.20 [1] [b]), but the "grossly unqualified" standard for disqualification of a sworn juror requires that the juror's inability to render an impartial verdict be "obvious" or "convincingly demonstrate[d]" (*People v Spencer*, 29 NY3d 302, 309 [2017], quoting and citing *Buford*, 69 NY2d at 298). The higher standard for sworn jurors ensures that jurors chosen by both parties are not later dismissed because of "speculation" or "minor incidents," which would undermine the voir dire process (*Rodriguez*, 71 NY2d at 219, 220). Accordingly, "[i]n concluding that a juror is grossly unqualified, the court may not speculate as to possible partiality of juror based on her equivocal responses" (*Buford*, 69 NY2d at 299).

However, the defendant's right to an impartial jury demands that even a sworn juror must be dismissed if the record "convincingly demonstrate[s] that the sworn juror cannot render an impartial verdict" (*Spencer*, 29 NY3d at 310). In reaching the conclusion that this standard was met here, we are guided by our decision in *People v Rodriguez* (71 NY2d 214), which suggests that a strong bias harbored directly against the defendant strikes at the core of the right to an impartial jury and will render a juror grossly unqualified absent a showing that the bias will not affect the verdict. In *Rodriguez*, we held that where a juror is "racially or otherwise invidiously biased against the defendant," the juror is presumed to be grossly unqualified (71 NY2d at 220). We stated that this understanding of the "grossly unqualified" standard was demanded by the defendant's right to an impartial jury (*id*. at 218, 220). In a system that requires jurors to judge the guilt or innocence of a defendant based on the evidence rather than on beliefs and assumptions, bias directly against a defendant cannot be brushed off as "insignificant" or "minor" like irritation with an attorney or knowledge of a collateral fact (*id.* at 219-220; *see Buford*, 69 NY2d at 298). A juror who clearly holds a bias directly against the defendant generally cannot render a verdict that respects the defendant's right to an impartial jury. That inability would render her grossly unqualified. Therefore, the only way such a juror may be retained is if there is a showing, "including unequivocal assurances," that the juror's bias will not affect her deliberations (*Rodriguez*, 71 NY2d at 220).

Because the juror's bias here was strongly held and ran directly against the defendant, the danger to the defendant's right to an impartial jury reached a level that would render the juror grossly unqualified. Juror Six's fear that she had been followed home by

Mr. Fisher is a less stark form of bias than the explicit racial prejudice expressed by the juror in *Rodriguez*, but is similar in that it is a prejudicial belief about the defendant that is not based on the evidence at trial. Juror Six's concern was not about witnesses or collateral matters, but about the defendant's character, specifically whether he was following her intending to harm or intimidate her. The note sent by the jury foreperson stated that one juror [Juror 6] "feels she may have been followed home Monday by Mr. Fisher," and when the court thereafter asked her, "you felt that Monday, after jury selection, that you may have been followed home by Mr. Fisher," Juror Six answered "[y]es." She informed the court that she was 95% certain that the person in the car that followed her home was Mr. Fisher, though she admitted it was possible that Mr. Fisher "may have simply been going somewhere." She further told the court that she believed that other jurors were concerned that Mr. Fisher or those observing his trial might harm them—a state of mind that is extremely likely to produce prejudice. Importantly, her fear was not based on record evidence, but rather on her own out-of-court observations and discussions with other jurors. Because Juror Six held irrelevant and prejudicial beliefs about the defendant himself, her concerns implicated the core of the right to an impartial jury, and dismissal of the juror was required unless the trial court made a determination supported by the record that she could set aside her concerns (*Rodriguez*, 71 NY2d at 220).

Our conclusion that Juror Six was "grossly unqualified" is further supported by the fact that she violated the court's instructions when she failed to inform the court promptly about her beliefs about the defendant and instead introduced those beliefs into jury deliberations. Jurors are admonished to decide cases based solely on the evidence

presented, and even if true, out-of-court evidence regarding a defendant's character would never be a proper consideration in evaluating the charges against a defendant. It was clearly inappropriate for Juror Six to introduce such information into deliberations, prompting or validating the safety concerns of other jurors. Nothing in the court's colloquy confirmed that Juror Six would follow the court's instructions in the future or even that she would cease to discuss her beliefs with the other jurors. Juror Six's actions in this regard therefore support our conclusion that the problems with her state of mind rise to the same level as the "invidiously biased" mindset that we found in *Rodriguez* would render a juror grossly unqualified (71 NY2d at 220).

Despite noting that Juror Six had introduced a strong and likely unjustified fear of the defendant into deliberations, the trial court nonetheless retained the juror because it found that the defendant most likely had not actually followed Juror Six and because it relied on her assurances that despite her concerns, she could be fair and impartial. The trial court erred in concluding that those factors provided grounds to deny a mistrial. Although *Rodriguez* contemplates that an initial showing that a juror is biased towards the defendant may be rebutted by a showing, "including unequivocal assurances," that the juror's bias will not affect her deliberations (71 NY2d at 220), there was no such showing here.

The trial court's observation that the juror's belief was apparently unfounded supports, rather than rebuts, the conclusion that she was grossly unqualified. The trial judge was skeptical of the juror's identification of Mr. Fisher from six to eight car lengths away, and stated that even if it was Mr. Fisher, he likely was not following the juror. But if the juror was wrong in believing the driver was Mr. Fisher, or was imputing negative motives

towards Mr. Fisher regarding an event with an innocent explanation, this would strengthen the case that she was grossly unqualified to render a verdict on his case. Indeed, drawing negative inferences against the defendant from facts extraneous to the trial evidence is exactly what jurors may not do in a system founded upon the presumption of innocence. Juror Six's insistence, after questioning by the court about the basis of her belief, that she was 95% certain that Mr. Fisher had followed her, further demonstrates the strength of her biased state of mind.

The trial court was correct to weigh Juror Six's assurances as a relevant factor but erred in concluding that they cured her bias under these circumstances. Certainly, there are numerous cases in which we have held that an assurance of impartiality was sufficient to overcome indicia of bias (*see e.g. People v Warrington*, 28 NY3d 1116 [2016]; *People v Dukes*, 8 NY3d 952 [2007]; *People v Harris*, 99 NY2d 202 [2002]; *People v Cargill*, 70 NY2d 687 [1987]; *People v Williams*, 63 NY2d 882 [1984]). However, we have also stated repeatedly that assurances of impartiality are not magic words (*see People v Blyden*, 55 NY2d 73, 76-78 [1982] [assurances "have no talismanic power to convert a biased juror into an impartial one]; *People v Torpey,* 63 NY2d 361, 367 [1984] [assurances are not "a facile method for purging a prima facie showing of bias"], quoting *People v Culhane*, 33 NY2d 90, 104 n 2 [1973]). Rather, assurances "must be taken in context" to determine the ultimate issue—here, whether the juror is grossly unqualified (*Blyden*, 55 NY2d at 78).

As we observed in *People v Torpey*, "virtually all" of our cases involving actual bias are "premised on the juror having expressed an opinion as to the guilt of the defendant for the charges being tried" (63 NY2d at 366). In that situation, the trial evidence can refute

the juror's prior opinion, and a declaration by the juror that she can decide the case based solely on the evidence at trial can be meaningful. But where bias is unrelated to the crime for which the defendant was charged, it cannot be directly rebutted by the trial evidence. Although *Torpey* applied the lower standard applicable to a challenge for cause during voir dire, the distinction still carries force in determining if a sworn juror's bias renders that juror grossly unqualified. Juror Six's bias is not the type that could be directly rebutted by the trial evidence, and she did not renounce her belief about Mr. Fisher's out-of-court conduct.

Moreover, when the court asked if Juror Six could be "fair and impartial," her response was equivocal. She stated: "I can be a fair and impartial juror, yes. *I say that, because the other juror members encouraged me, because their safety may be at risk*" (emphasis added). That explanation could be read to indicate that her assurance was made because other jurors encouraged her to make it, and in any case indicates that she remained focused on the "risk" posed by Mr. Fisher to the jury. By reiterating her concern for safety even while assuring the court that she could be fair, Juror Six undercut the value of her assurance.

Her remaining answers, one-word affirmative responses to formulaic questions from the court, do not support the conclusion that she could put her bias aside in light of the surrounding context. If Juror Six had acknowledged that she was mistaken or in some other manner indicated that she no longer believed Mr. Fisher was a threat, such answers might have supported a finding that her state of mind had changed such that she was no longer grossly unqualified (*cf. People v Sher*, 24 NY2d 454, 457 [1969] [upholding a

verdict after the juror stated that an outside attempt to sway his vote "strengthened [his] resolve to be completely impartial and governed by the evidence alone"]). Here, however, that did not occur.

III.

Strongly held, prejudicial beliefs about the defendant which are not based on the trial evidence strike at the heart of the right to an impartial jury, and therefore render a juror "grossly unqualified" unless the bias can be cured or set aside. Given the extent of Juror Six's prejudicial beliefs and her introduction of those beliefs into deliberations, it was error to conclude that the issue was cured merely by "yes" answers to formulaic questions.

Accordingly, the order of the Appellate Division should be reversed and a new trial ordered.

Order reversed and a new trial ordered. Opinion by Chief Judge Wilson. Judges Rivera, Garcia, Singas, Cannataro, Troutman and Halligan concur.

Decided April 23, 2024