481 A.2d 201
**Derrick Quinton WHITE**

v.

**STATE of Maryland.**

**Nos. 20, 82, Sept. Term, 1982.**

Court of Appeals of Maryland.

Sept. 13, 1984.

722

Gary W. Christopher and George E. Burns, Jr., Asst. Public Defenders (Alan H. Murrell, Public Defender, Baltimore, on brief), for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen. and Deborah K. Handel, Asst. Atty. Gen., Baltimore, on brief), for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

RODOWSKY, Judge.

Derrick Quinton White (White) was convicted by a jury in the Circuit Court for Baltimore County of capital murder and other offenses. The jury also determined that the sentence should be death. On this consolidated appeal and sentence review pursuant to Md.Code (1957, 1982 Repl.Vol.), Art. 27, § 414 we shall affirm both the verdict and the sentence.

On August 14, 1981 White, then age 18, shot and killed Victor Joseph Furst (Furst), age 61, during an attempt to rob Furst of the moped he was riding. The State proved

the following facts, in large part through White's accomplice, Gerard Eugene Anthony (Anthony), also age 18.

White and Anthony each lived on the west side of Baltimore City. They had known one another for about two months prior to the murder. Neither was employed. They had discussed getting some money illegally. On the morning of August 14 Anthony took his father's loaded revolver from their home and met White nearby. Anthony put the gun in the glove compartment of the red 1981 Pontiac T1000 which White had been driving. With Anthony at the wheel of the car, they drove into western Baltimore County. White directed them to a tile store at Rolling Road and Route 40 West which they intended to rob. With White in possession of the gun, they entered the store; but it was too crowded and they left.

Anthony resumed driving with White in the front passenger seat giving directions to another store in the vicinity to rob. On their way they drove by Furst, who was riding a new moped in the opposite direction. White told Anthony that it was a good model moped, that an old man was riding it and that they were going to get it. Anthony said they should forget about the moped and "go to the money." White persisted and said that the moped would fit in the back of the Pontiac. Anthony turned the car around. They pursued the man on the moped and caught up to him in the 7400 block of Dogwood Road.

As Anthony drove abreast of Furst, White pointed the gun out of the window on the passenger side at Furst. About five seconds later White fired, as Furst was turning his head away from the gun. Anthony immediately accelerated leaving Furst and the moped lying alongside the road. When Anthony asked "what the hell did he do that for," White said that "[Furst] looked like he wasn't going to stop." Furst died of a single gunshot wound which entered his chest from left to right and pierced the aorta.

Within one-half hour of the shooting the murderers were arrested nearby, in the Pontiac. Occupants of a car which

had been proceeding toward the scene at the time of the crime described the red car and gave partial descriptions of its driver and passenger. At the time of arrest, the handgun, with one spent cartridge in the chamber and five live rounds in the cylinder, was recovered from the floor of the front passenger seat occupied by White.

White took the stand at the guilt or innocence phase of the proceedings, although he declined to testify at the sentencing phase. He denied being with Anthony at the time of the murder. White's story was that he had met Anthony and another youth, known to White only as "Tony," in Baltimore City and had gotten a ride with them in Anthony's car to a pizza parlor in western Baltimore County where White unsuccessfully applied for a job. When Anthony returned sometime later to drive White back into the city, Tony was no longer in the car and Anthony told White that they had "popped" someone.

## I

Before addressing appellant's points, we must decide whether there is a final judgment. Section 414(a) provides that "[w]henever the death penalty is imposed, and the judgment becomes final, the Court of Appeals shall review the sentence on the record." Under subsection (d) any appeal from the verdict is consolidated in this Court with the sentence review.

The State charged White, separately from Anthony, in a five-count criminal information alleging murder in the first degree, attempted robbery, use of a handgun in the commission of a crime of violence, unauthorized use of the Pontiac [1] and possession of marijuana.[2] The jury found White guilty on each count and, in response to a special interrogatory, also found that White shot and killed Furst in an attempt to

---

1. The car had been stolen in June of 1981 from a new car dealer.

2. Five marijuana cigarettes were found in White's pocket when he was arrested.

rob Furst of his property. As reflected by the docket entries, the court subsequently granted a motion for judgment of acquittal on the unauthorized use count. Approximately six weeks after the jury had determined the sentence of death on count one, White's motion for a new trial was heard, and overruled. Thereupon the circuit court signed a death warrant, execution of which was immediately stayed. No sentence was imposed on the other counts.

The charge of attempted robbery merged into the murder conviction. *See State v. Frye*, 283 Md. 709, 393 A.2d 1372 (1978); *Newton v. State*, 280 Md. 260, 373 A.2d 262 (1977). The handgun charge, however, did not merge. *See* Art. 27, § 36B(d) and *Whack v. State*, 288 Md. 137, 416 A.2d 265 (1980), *appeal dismissed*, 450 U.S. 990, 101 S.Ct. 1688, 68 L.Ed.2d 189 (1981). Nor did the marijuana charge. As to the offenses other than murder the docket entry in relevant part reads: "No Sentence imposed as to Balance of Counts. Court costs waived. Commit sent." We interpret this docket entry to mean that sentence was suspended generally on the handgun and C.D.S. possession counts.

Under these circumstances, Md.Code (1974, 1984 Repl. Vol.), § 12–301 of the Courts and Judicial Proceedings Article (Courts Article) applies. Its last sentence specifies that "[i]n a criminal case, the defendant may appeal even though imposition or execution of sentence has been suspended." And *see Lipscomb v. State*, 223 Md. 599, 601, 165 A.2d 918, 920 (1960). We hold that the judgment in this case has become final, within the meaning of Art. 27, § 414(a) as well as under § 12–301 of the Courts Article so that this Court has jurisdiction to proceed.

## II

### A

The first of appellant's challenges to the guilty verdict attacks the denial of his challenge for cause to a prospective juror, John J. Cardarelli (Cardarelli). After a voir dire in open court, in which the relatively standard questions in

any criminal case had been asked, the prospective jurors were individually questioned in chambers concerning their attitudes toward the death penalty. During his individual voir dire Cardarelli volunteered that he thought police officers could persuade him over someone who had been accused of a crime. His answers to further questioning by the State convinced the trial judge that Cardarelli was not disqualified for bias, so that White's motion to strike Cardarelli for cause was denied.

After the better part of two days a pool of fifty eligible jurors had been assembled. As the court called individual talesmen to the box the parties exercised their peremptory challenges, ten for the State and twenty for White. *See* Maryland Rule 753 a 1.[3] When twelve talesmen had cleared the first round of peremptory challenges, the State had utilized five of its strikes and White ten of his. Two alternate jurors were then selected, a process for which additional peremptory challenges are allowed, *see* MD.R. 753 a 3, and with which we are not concerned here.

The parties then, per Rule 753 b 4, began the exercise of their remaining peremptory challenges against the prospective jurors who were in the box and against those called forward from the general body of veniremen as substitutes. During this process Cardarelli was called forward and White used his thirteenth peremptory challenge to exclude Cardarelli. When the State had exercised eight peremptories and White nineteen, the following colloquy took place:

THE COURT [addressing White's counsel]: And then you have one more peremptory challenge that you may exercise at this time as to the twelve jurors.

[WHITE'S COUNSEL]: I'll not exercise, Your Honor.

THE COURT: All right.

[WHITE'S COUNSEL]: Jury panel[']s acceptable as constituted. I still have one challenge to the alternate.

---

3. All references are to the Maryland Rules of Procedure as they existed immediately prior to the revision effective July 1, 1984.

The State then struck the talesman in seat No. 6, White exercised his last peremptory to exclude the first substitute called and the No. 6 seat was filled by the next person from the list. The State used its last peremptory against prospective juror No. 3 and another person was seated there. Counsel for White gave no indication that he would have used a peremptory challenge against either of the last two jurors seated if the defense still had a strike to exercise.

Just before the jury was sworn the court addressed defense counsel.

[D]o you have any objection you wish to register, you have made an objection when the Court has excused or failed to excuse a juror for cause. That's already on the record. Do you have any objection to the proceeding by which this jury was empaneled. I tried to honor everybody's wishes.

[WHITE'S COUNSEL]: No, I have no objection to any of that. *My only objection* would be that I felt Harris should have been called, if you insist she be struck for cause. [Emphasis added.]

THE COURT: The record clearly indicates that Vanessea Harris was challenged for cause. It was done over your objection.

[WHITE'S COUNSEL]: Yes, Your Honor.

Clearly the claimed bias of Cardarelli did not influence the verdict because Cardarelli did not serve on the jury; but White used a peremptory challenge to keep Cardarelli off the jury and White exhausted all of his strikes before the jury was sworn. Nevertheless, even if we assume error in not striking Cardarelli for cause, White is not entitled to a new trial because the assumed error is waived.

■ If disqualification for cause is improperly denied, but the accused has not exercised all allowable peremptory challenges, there is no reversible error. *See Parker v. State,* 227 Md. 468, 471, 177 A.2d 426, 428 (1962) ("[W]e think it is clear that the defendant (who had not exhausted his challenges) was not prejudiced."); *Thomas v. State,* 50

Md.App. 286, 437 A.2d 678 (1981), *cert. denied,* 292 Md. 639 (1982); *Earhart v. State,* 48 Md.App. 695, 429 A.2d 557 (1981); *McCree v. State,* 33 Md.App. 82, 363 A.2d 647 (1976).

■ We have also held that a claim of error in the denial of a challenge for cause was waived by defense counsel's announcing satisfaction with the jury after all peremptory challenges had been exhausted. *See Calhoun v. State,* 297 Md. 563, 579–80, 468 A.2d 45, 52 (1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984) and Joint Record Extract, Vol. V at 709–26, *Calhoun v. State.* Defense counsel's affirmation of the acceptability of the jury has been held to waive a challenge to an array which was not selected from voting lists, *Glover, Robinson & Gilmore v. State,* 273 Md. 448, 330 A.2d 201 (1975), and to waive objection to a panel which had overheard prejudicial remarks, *Neusbaum v. State,* 156 Md. 149, 143 A. 872 (1928), but not to waive the right to obtain review of the denial of a request to inspect the prosecution's dossier on the veniremen, *Couser v. State,* 282 Md. 125, 383 A.2d 389, *cert. denied,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 156 (1978).

Appellant places principal reliance on *Tisdale v. State,* 30 Md.App. 334, 353 A.2d 653 (1976), which held that counsel's expressed satisfaction with the jury did not waive the claim of error in rejecting a challenge for cause. That result contradicts and is superseded by this Court's later holding in *Calhoun.*

Citing *Lockhart v. State,* 145 Md. 602, 125 A. 829 (1924), appellant in effect says that the erroneous refusal to strike for cause always requires reversal when peremptory strikes are thereafter exhausted because the ruling of the court reduces the defendant's allotment of peremptory challenges. *Lockhart*'s holding, however, illustrates that the rule which White advocates is not universal. In that case the trial judge had announced that the parties would not be held strictly to the statutory limit of four peremptories. All parties took substantial advantage of this judicial generosi-

ty.   Eventually the court had to reinstate the limit in order to bring jury selection to a close.   By that route the defendants exhausted their peremptory strikes.   On appeal this Court concluded that error was committed in refusing a strike for cause but held that reversal was not required on a combined waiver and harmless error rationale.   We said (*id.* at 620–21, 125 A. at 835):

> It is clear that [the defendants] could not reasonably complain of the irregular method, thus accepted, by which [the enlargement of their challenged rights] was accomplished.   If the legal right of the defendants to the use of peremptory challenges had been actually reduced by any of the trial court's rulings, we should not require affirmative proof of resulting injury as a condition of reversal. But when it appears that in consequence of an extraordinary procedure, conducted with their assent, the defendants had the use of peremptory challenges beyond the legal limitation, apart from the one expended for the exclusion of the talesman who should have been excused for cause, and when for that reason no restrictive effect upon their legal rights can be attributed to the ruling found to be erroneous, the fact that the record does not suggest to us any reason to doubt the competency or impartiality of any member of the trial jury as finally impanelled is a material consideration supporting the view that the error is not reversible.
>
> In view of the special conditions described, we would not be justified in reversing the judgment and awarding a new trial upon the theory that the rights of the defendants in regard to the selection of the jury were injuriously restricted.

More recently, *King v. State Roads Comm'n,* 284 Md. 368, 396 A.2d 267 (1979) dealt with an error which affected peremptory challenges.   The litigants in that civil case had been furnished a list of twenty-five veniremen from which to exercise their four strikes respectively, rather than a list of twenty as required by rule.   Thereafter the judge struck

five names. In remanding to determine whether the error had been waived by failure to object, we said that

the importance of the peremptory challenge requires that any significant deviation from the prescribed procedure that impairs or denies the privilege's full exercise is error that, unless waived, ordinarily will require reversal without the necessity of showing prejudice. *Swain v. Alabama,* [380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759, 772 (1965).] [284 Md. at 371, 396 A.2d at 269.]

■ In the case at bar the defense expressly accepted the panel when it included ten of the twelve jurors who actually served. After White's peremptories were exhausted, the membership of the panel changed by two. After those two persons were seated and before the jury was sworn, the court invited objections to the proceeding by which the jury was impaneled. Defense counsel told the court he had none. He further told the court that his "only objection" related to the *exclusion* of a prospective juror for cause, even though the court had pointed out that objections to excusing or failing to excuse a juror were already on the record, and, in effect, need not be repeated. Counsel's voluntary limitation on objections made to jury selection, coupled with his having shortly before pronounced as acceptable the jury as then constituted, demonstrate the defense's continued satisfaction with the panel and acceptance of the jury that served. Therefore, any error in denial of the challenge for cause was waived. The substance of the statements and their effect in this case are the same as in *Calhoun v. State, supra.*

## B

■ White next argues that a letter from him to the accomplice, Anthony, should not have been admitted into evidence because of a discovery violation by the State.

Anthony testified for the State. Defense counsel closed cross-examination by emphasizing Anthony's plea agreement and release on bail. On redirect the State introduced

the written plea agreement, which contained a promise by Anthony to testify truthfully. Seizing that provision as an excuse for recross-examination, White's counsel produced a letter from Anthony to White in which Anthony in part said that he would not let White "get burned, unless I can [sic] help it ...." Counsel suggested that this meant that Anthony and not White had killed Furst. Anthony denied the suggestion and testified that White had telephoned him to urge that he not cooperate with the State. Anthony's letter to White refers to that telephone conversation and also to a letter written by White to Anthony. On re-direct the State was permitted, over objection, to introduce the letter. In it White urges Anthony to decline to cooperate with the police if requested to do so. ("If they come at you with some Mickey Mouse shit, tell them to kiss your ass. O.K.[?]").

Counsel's objection at trial which White argues here is that "the State did not . apprise me on my motion for discovery that they had such a letter ...." About one week before trial Anthony told the prosecutor about the letter, but the State did not have possession of it until the morning on which Anthony testified.

MD.R. 741 controls. In relevant part it reads:

a. *Disclosure Without Request.*

Without the necessity of a request by the defendant, the State's Attorney shall furnish to the defendant:

. . . .

2. Any relevant material or information regarding: (a) specific searches and seizures, wire taps and eavesdropping, (b) the acquisition of statements made by the defendant, and (c) pretrial identification of the defendant by a witness for the State.

3. The State's Attorney's obligations under this section extend to material and information in the possession or control of members of his staff and of any others who have participated in the investigation or evaluation of the

case and who either regularly report or with reference to the particular case have reported to his office.

b. *Discovery by the Defendant.*

Upon the request of the defendant, the State shall:

1. Witnesses.

Disclose to the defendant the name and address of each person then known whom the State intends to call as a witness at the hearing or trial to prove its case in chief or to rebut alibi testimony.

2. Statements of the Defendant.

As to all statements made by the defendant to a State agent which the State intends to use at a hearing or trial, furnish the defendant: (a) a copy of each written or recorded statement and (b) the substance of each oral statement and a copy of all reports of each oral statement.

Appellant's objection is in substance that the State failed to furnish him with a copy of his letter to Anthony. Discovery of copies of statements is governed by MD.R. 741 b. But the State is not required to produce a copy of a statement by the defendant unless it was made to a State agent and is one which the State intends to use at a hearing or trial. MD.R. 741 b 2. Here Anthony, to whom the letter was written, was not a State agent. Further, White has not demonstrated that the letter was one which the State intended to use at trial. Our reading of the record indicates that the relevance of the letter arose fortuitously after the State had concluded its direct and redirect examination of Anthony. *See State v. Parker*, 416 So.2d 545 (La.1982); *People v. Goodson*, 57 N.Y.2d 828, 442 N.E.2d 54, 455 N.Y.S.2d 757 (1982).

Without mentioning Rule 741 b 2, White pitches his argument directly on Rule 741 a 2, which has no application. The "statements made by the defendant," which are embraced within MD.R. 741 a 2, are statements made to a State agent which the State intends to use at trial. This is clear from the relationship of Rule 741 a 2 to Rule 736,

dealing with motions before trial. Section a of the latter rule provides in relevant part:

    a. *Mandatory Motions.*

A motion asserting one of the following matters shall be filed in conformity with this Rule. Any such matter not raised in accordance with this Rule is waived, unless the court, for good cause shown, orders otherwise:

    . . . .

    4. An unlawfully obtained admission, statement or confession[.]

Rule 741 became effective July 1, 1977. It was part of the revision of Ch. 700 (Criminal Causes) proposed by the Fifty-Third Report of the Rules Committee. Records of the Rules Committee reflect that the purpose of Rule 741 a 2 is to force the defendant to file certain motions before trial, including a motion to suppress an unlawfully obtained statement.

Prior to the 1977 revision, Rule 728 governed discovery in criminal causes and that number was initially utilized for the proposed revised discovery rule during Rules Committee deliberations. At the full committee meeting of February 1–2, 1974, the subcommittee on the revision of Ch. 700 was requested to redraft its then proposed Rule 728 in order to utilize language in the report of a joint committee of the Maryland Judiciary and of the Maryland State Bar Association on ABA Standards of Criminal Justice.

Section 2.3 of the American Bar Association's Standards Relating to Administration of Criminal Justice, Discovery and Procedure Before Trial (1970) in relevant part read that

the prosecuting attorney shall, upon request of defense counsel, disclose and permit inspection . . . of any relevant material and information regarding:

    (a) specified searches and seizures [and]

    (b) the acquisition of specified statements from the accused[.]

In its commentary accompanying publication of Section 2.3 the ABA explained how

[s]ubsections (a) and (b) deal with the circumstances under which searches and seizures were made and statements were taken from the accused, matters which may affect the admissibility of evidence if law enforcement agents acted illegally.

By the time of the Rules Committee meeting of March 14–15, 1975, three paragraphs of proposed new Rule 728 dealt with discovery to be furnished by the State to the accused. Paragraph a, captioned *"Matters Discoverable by the Defendant,"* listed matters to be furnished by the State upon request. Paragraph c, captioned *"Mandatory Disclosure,"* was limited to exculpatory material.. Relevant here is proposed ¶ b, entitled *"Discovery as the basis for a motion to suppress,"* which read:

The State shall furnish the defendant with any relevant material or information regarding (1) specific searches and seizures, (2) the acquisition of statements made by the defendant, and (3) pre-trial identification of the defendant by a witness for the State. Information required by this section may be furnished by the State without a request from the defendant.

Within the Rules Committee the proposed new criminal rules were referred to a style committee whose draft would become the Rules Committee's working draft for final review prior to submission to this Court. Minutes of the Rules Committee meeting of September 12–13, 1975 reflect the following concerning Rule 728.

Section b of this rule was designed to allow the State at its option to furnish the defendant with relevant material or information that would force the defendant to file a motion to suppress, prior to trial. The Style Committee questioned whether the committee desired to allow the State to do this at its own election or whether it should be mandatory. The committee voted that the section should be mandatory.

In a draft circulated October 10, 1975 Rule 741 a 2 emerged from the Style Committee in a form very near that

in which it was adopted by this Court. This draft renumbered the discovery rule to 741 and, in relevant part, read:

### 741. DISCOVERY AND INSPECTION.

A. *Disclosure Without Request*

The State shall, without the necessity of a request by the defendant, furnish to the defendant:

. . . .

2. Any relevant material or information regarding: (a) specific searches and seizures, (b) the acquisition of statements made by the defendant, and (c) pretrial identification of the defendant by a witness for the State.

This process produced a rule under which material or information dealing with the circumstances in which a statement was obtained from the accused by a State agent was to be automatically produced by the State, in order to trigger the running of the time for filing a motion to suppress, while the statement made to the State agent was produceable only on request by the accused.

Disclosures required by Rule 741 a 2 must be made by the State within 25 days after the earlier of the appearance of counsel or the first appearance, pursuant to Rule 723, of the defendant. *See* MD.R. 741 e 1. The accused is then required to file the Rule 736 a mandatory motions within five days thereafter, or within five days after discovery is furnished. *See* MD.R. 736 b. Because statements made to third parties who are not State agents cannot ordinarily be the subject of a motion to suppress on the ground that they have been unlawfully obtained, they are not within the ambit of disclosure required by Rule 741 a 2.

There was no violation of Rule 741 by the State. Consequently we do not reach the question of whether the trial court abused its discretion by not excluding the letter from evidence as a sanction for the claimed violation.

### C

The final contention bearing on the verdict involves denial of a mistrial. During the defendant's case a

prisoner at the Baltimore County jail, Anthony Brown (Brown), testified that the accomplice, Anthony, had said he would not let White "burn" for something White had not done. The prosecutor opened his cross-examination by asking, "Now, Mr. Brown, you're over in the Baltimore County Jail awaiting trial on another murder charge, aren't you?" Objection was sustained and the court, *sua sponte*, immediately instructed the jury as follows:

THE COURT: He has testified he's in jail. It doesn't make any difference what he's in jail for.

He could be there for non-support or a more serious crime, and I want the jury to completely put out of their minds and completely disregard any statement or any question as to what he's there for.

White's motion for mistrial was denied at that point.

After the State had cross-examined Brown, the judge again instructed the jury, saying:

In weighing the testimony of the last witness, Anthony Brown, I charge you to completely disregard any reference to the reason that the witness is now in the Baltimore County Jail. That should not be considered one iota. Put it out of your mind and ignore it, because any reference to why he is being held there now does not relate to a conviction for a crime of moral turpitude.

Appellant argues that we should conclude that the experienced prosecutor acted in bad faith and that the instructions by the court could not effectively cure the damage, so that a mistrial was the only appropriate response.

The grant or denial of a mistrial is necessarily left to the discretion of the trial judge, and our review is limited to whether there has been an abuse of discretion in denying the motion. *See Poole v. State*, 295 Md. 167, 183, 453 A.2d 1218, 1227 (1983); *Wilhelm v. State*, 272 Md. 404, 413, 326 A.2d 707, 714–15 (1974). In light of the trial court's prompt and firm intervention, we see no abuse of discretion in denying a mistrial.

## III

In this part we address the assignments of error relating to the sentencing proceeding and the death sentence.

The jury which had on Wednesday, February 24, 1982 found White guilty returned on Friday, February 26 for the sentencing proceedings. The only aggravating factor present was that the murder had been committed while White was attempting to commit robbery. There were two mitigating factors. The first was the absence of any conviction for a crime of violence. This finding was instructed by the court, which interpreted "crime of violence" as used in Art. 27, § 413(g)(1) to exclude determinations of juvenile delinquency based on the commission of a crime of violence. The jury also determined that White's environment mitigated.

## A

White was 18 years and 4 months old when he killed Furst. This chronological age, appellant urges, requires finding "[t]he youthful age of the defendant" as a mitigating factor. Sec. 413(g)(5).

*Stebbing v. State,* 299 Md. 331, 473 A.2d 903 (1984) has rejected a pure chronological age approach to the "youthful age" mitigating factor. In that case we considered prior criminal conduct, home environment, marital status, degree of maturity, and alcohol and drug abuse, among others, as factors relevant to the concept of "youthful age."

White's juvenile record started at age 13 and is summarized below.

| Date of Offense | Offense | Disposition |
| --- | --- | --- |
| July 23, 1976 | Breaking and entering | Probation |
| October 10, 1976 | Breaking and entering | Probation |
| October 21, 1976 | Breaking and entering | Probation |
| February 25, 1977 | Breaking and entering | Probation |
| August 31, 1977 | Robbery (apparently purse snatching) | Committed to Juvenile Services Administration—Institutions |

| Date of Offense | Offense | Disposition |
|---|---|---|
| February 1, 1978 | Six counts involving a single victim. Charges include robbery with a dangerous and deadly weapon | Commitment to Juvenile Services Administration for placement |

On February 27, 1980 White was committed to the Baltimore City jail on a charge of burglary on which he was convicted on July 7, 1980. That same day a sentence of five years was imposed. He was paroled June 5, 1981.

White has completed 11 grades of school. His brother describes him as having run with a crowd which frequented disco nightclubs. He apparently had a few girl friends, by one of whom White fathered a son who was born after the trial.

Our test for determining whether a sentencing authority erred in failing to find a mitigating factor is whether *"any* rational sentencing authority could have concluded that the accused failed to prove the claimed mitigating circumstance by a preponderance of the evidence." *Stebbing v. State,* *supra,* 299 Md. at 362, 473 A.2d at 918 (emphasis in original). Here, under the facts reviewed above, the jury could rationally have concluded that youthful age was not a mitigating factor.

## B

A parole agent testified for the State at the sentencing phase that White was paroled on June 5, 1981 and had come under the witness' supervision on August 5, 1981. Appellant seems to assume that the testimony can only be relevant to the mitigating circumstance listed in § 413(g)(7), *i.e.,* that "[i]t is unlikely that the defendant will engage in further criminal activity that would constitute a continuing threat to society." As appellant sees it, the testimony was not admissible to negate that mitigating circumstance because White had not affirmatively put on any proof, and

had not argued, that the jury should find the mitigating circumstance applied to him.

First, it is appropriate for a sentencing authority in any criminal case to consider that the offense for which the defendant is to be sentenced was committed while the defendant was on parole or probation involving another offense. Maryland's capital murder statute provides for the admissibility in the sentencing proceeding of "[a]ny other evidence that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements." Sec. 413(c)(1)(v). And *see Johnson v. State*, 292 Md. 405, 442–43, 439 A.2d 542, 562–63 (1982); *Scott v. State*, 297 Md. 235, 465 A.2d 1126 (1983). This provision includes the proof challenged here.

Secondly, proof that White was on parole at the time of the murder is relevant to the mitigating circumstance dealing with the unlikelihood of further criminal activity that would constitute a continuing threat to society. It is not necessary for one convicted of capital murder first to introduce evidence, or to argue, in support of finding this mitigating circumstance before the State may properly introduce evidence opposing such a finding. The issue is injected into the sentencing phase from its beginning because the special verdict at the guilt phase found an aggravating factor, and § 413(g) mandates that the jury consider each of the statutorily enumerated possible mitigating circumstances. MD.R. 772A implements this mandate by specifying the form to be utilized by the sentencing authority and that form presented the subject mitigating circumstance for consideration. To say that the subject possible mitigating circumstance is not an issue in the sentencing phase unless the convicted capital murderer invokes it would lead to the absurd consequence that, absent affirmative evidence or argument from the defendant, the court could instruct a sentencing jury that it could not find this mitigating factor to apply.

Alternatively, White contends that the proof of the date on which he was paroled, coupled with the court record furnishing the date on which the five-year sentence was imposed, enabled the jury to calculate that White had been paroled eleven months into a five-year sentence and thereby "raise[d] the spectre" that White might not serve his entire sentence. Cases like *State v. Jones,* 296 N.C. 495, 251 S.E.2d 425 (1979) are cited in support. The proposition on which appellant relies deals with arguments by the prosecutor to a jury which invite the jury to speculate concerning possible parole, pardon or commutation in the future. The State made no such argument in this case. White's objection to the parole agent testimony was properly overruled.

## C

Appellant's brief also presents six arguments which have been rejected in previous decisions by this Court.

1. *Stebbing v. State, supra,* rejected the argument that THE SENTENCE OF DEATH MAY NOT BE IMPOSED UPON CONVICTION OF FELONY MURDER WHERE THE ONLY AGGRAVATING FACTOR ALLEGED OR FOUND WAS THAT THE MURDER WAS COMMITTED IN THE COURSE OF THE FELONY.

2–4. *Calhoun v. State, supra,* rejected the arguments that

Article 27, sec. 413(d)(10), which permits imposition of the death penalty upon proof that the murder was committed during the commission or attempt to commit a specified felony, is an unconstitutional aggravating factor[; and that]

Article 27, sec. 413(c), renders the death penalty in Maryland unconstitutional[; and that]

Article 27, secs. 413 and 414, unconstitutionally restrict the discretion of the finder of fact in determining whether the death penalty should be imposed.

5–6. *Tichnell v. State,* 287 Md. 695, 415 A.2d 830 (1980) rejected the arguments that

. [t]he statute unconstitutionally places the burden of proof to show mitigation on the accused[; and that]

[t]he imposition of the death penalty violates Articles 16 and 25 of the Maryland Declaration of Rights.

## IV

We now address the proportionality review mandated by § 414. As a threshold matter appellant says that his case must be approached with "heightened scrutiny" because of the comment by the trial judge in his report which is required by MD.R. 772A. The rule calls for a recommendation as to whether the jury's imposition of death was justified. In this case the judge said it was "[q]uestionable in [his] mind because of absence of direct proof of specific intent to kill."

We agree that the inclusion of the recommendation in a trial judge's report was intended to flag those cases in which the presiding judge disagreed with a jury's determination of death, and we approach the review here cognizant that the very experienced trial judge considered the jury's determination to be "[q]uestionable." We also observe, however, that the court instructed the jury in this case on both premeditated and felony murder, that the State argued both premeditated and felony murder to the jury and that the jury returned a general verdict of guilty of first degree murder. Under the evidence and instructions, that verdict includes a finding of premeditated murder, even though, under the special interrogatory, the jury also found felony murder.

When we undertake to match the instant case with other capital murder cases which have been presented to a sentencing authority under Maryland's current death penalty statute, we find that this murder is almost unique. There seems to be no other case in the inventory in which the killer by pure chance passed by the victim on a public street in broad daylight, decided that the victim had some property which the killer coveted and then, without warning, de-

mand, or resistance by the victim, simply killed the victim in cold blood.

The most nearly comparable case is that of JAMES ALEXANDER FIELDS, JR., who was sentenced on October 8, 1982 by the Circuit Court for Prince George's County, Maryland to life imprisonment. On December 31, 1981 two brothers, Jessie Wilson, 70, and the victim, Murray Wilson, 72, parked their vehicle on the parking area in front of a store which Jessie entered to get directions. When Jessie returned to the vehicle Fields was standing by the passenger side punching Murray, who was inside the vehicle. Jessie got into the vehicle, presumably to drive away. Fields produced a handgun and demanded Jessie's wallet. Jessie released the clutch as he reached for his wallet, and the vehicle began to roll backward. When Murray shouted, "Run over the black son of a bitch," Fields shot and wounded Jessie, and shot and killed Murray. A jury deadlocked on sentence which resulted in life imprisonment pursuant to § 413(k)(2). This one case does not make White's sentence disproportionate. We must compare it generally to "similar cases."

We can compare this case to those cases in which the aggravating factor is the same, namely, committing or attempting to commit robbery when committing the murder. In this approach we do not include cases in which there were aggravating circumstances in addition to robbery, e.g., rape, sexual offenses, taking of a hostage, killing a law enforcement officer, or multiple murders. Limiting the inventory of comparable cases to those in which a death sentence was sought by the State based on the single aggravating factor of robbery would seem, on balance, not to weight the comparison against appellant. Within this frame of reference, there have been thirteen murder prosecutions tried to conviction. In seven of these the sentencing authority determined the penalty to be life imprisonment; in four the sentencing authority imposed death; and

in two the inability of the jury to agree resulted in life sentences under § 413(k)(2).[4]

DWAYNE T. MAYERS received a life sentence from a jury in Anne Arundel County on October 22, 1980 for the murder of an elderly woman during a housebreaking and robbery. The jury found mitigating factors preponderated. These were those listed as the first, fourth and fifth factors in § 413(g), namely, the absence of any prior conviction for a crime of violence, diminished capacity and youthful age. BRYAN KEITH QUICKLEY, a 16-year-old, killed the victim during the robbery of a furniture store. A judge of the Circuit Court for Harford County sentenced Quickley to life on November 6, 1980. His findings included, in addition to the first and fifth mitigating factors, "borderline range of intelligence" and the history of an "impoverished ... social and educational environment," as set forth in reports filed in the proceedings. RONALD LEROY JOHNSON was sentenced to life imprisonment on April 8, 1981 by a judge of the Circuit Court for Baltimore County for the murder of a 78-year-old woman during a burglary and robbery. The judge found that Johnson had acted "under substantial duress, domination or provocation of another person." There were no prior crimes of violence, and there was diminished capacity. Life imprisonment was also imposed on GARY ALLEN MILLER by a judge of the Circuit Court for Allegany County on November 16, 1981. The court found that the aggravating factor of robbery was outweighed by the absence of a prior crime of violence, by the victim's participation in the defendant's conduct, by diminished capacity and by non-exclusiveness of the defendant's act in proximately causing death. The victim had been

---

**4.** We do not include among the thirteen cases selected that of Clinton W. Ellison, who received a life sentence on January 19, 1983 in the Circuit Court for Baltimore City for the murder on October 25, 1981 of the assistant manager of a K-Mart store. The jury found that no aggravating circumstance had been proved beyond a reasonable doubt. Thus, on the official record the case is not one of capital murder.

beaten and strangled. In his report the trial judge describes the offense, in part, by saying:

Victim exposed himself to danger by reason of his out-of-character association with Defendant and others. He was intoxicated and was carrying considerable cash while frequenting taverns of poor repute. In addition, Defendant said that the victim made homosexual advances toward him.

A Montgomery County jury sentenced JACKIE HUGHES to life imprisonment on March 1, 1982 for a murder committed on a public street during a planned robbery. The victim was a restaurant manager who was on his way to make a bank deposit of business receipts. Although the manager was armed and did shoot and wound Hughes, it appears that Hughes was shot only after he had shot and fatally wounded the victim. The jury found the first statutory mitigating circumstance and on the sentencing form checked that "[o]ther mitigating circumstances exist," but did not specify them. In his report the trial judge advises that statutory factors 1, 4, 7 and 8 could have been considered under the evidence. CURTIS WAYNE MONROE received a life sentence on September 20, 1982 from a judge of the Montgomery County circuit court for the murder of an employee of a security alarm company during a break-in and robbery at a discount store. During that same robbery Monroe's co-felon killed a police officer. *See Calhoun v. State, supra,* 297 Md. 563. The sentencing judge found it unlikely that Monroe would engage in further criminal activity threatening to society and that Monroe had been employed, has a wife and two children and was furthering his education. In his report, the judge explained that his primary considerations were comparison to other cases in his circuit court where death had been sought but not imposed and comparison of Monroe's case to that of Calhoun. On February 3, 1983 a judge of the Circuit Court for Anne Arundel County sentenced MICHAEL SPENCER ALLEN to life imprisonment for a murder during a gas station

robbery. The judge found Allen "clearly suffers from disruptive psychiatric disorders."

In addition to the Fields case, described above, a jury deadlock produced a life sentence for JAMES THOMAS PORTER in the Circuit Court for Anne Arundel County on October 5, 1979.

Of the four murders for which death sentences have been imposed where robbery was the sole aggravating factor, the one which bears more similarity to White's case than do the others is that of DORIS ANN FOSTER. A Cecil County jury convicted her of capital murder and sentenced her to death on April 4, 1984 at a retrial, after this Court had reversed an earlier conviction and death sentence. *See Foster v. State*, 297 Md. 191, 464 A.2d 986 (1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 985, 79 L.Ed.2d 221 (1984). While we have not reviewed this current sentence, it is presumptively valid. *See Stebbing v. State, supra*, 299 Md. at 376, 473 A.2d at 925. Foster lured the proprietress of a motel into a vacant unit where Foster stabbed the victim, in order to loot the motel office. In this respect Foster, like White, killed before taking any other overt steps to steal the victim's property.

The death sentence of EUGENE SHERMAN COLVIN, who murdered during a daytime housebreaking and robbery, has been reviewed and affirmed by this Court. *Colvin v. State*, 299 Md. 88, 472 A.2d 953 (1984). JACKIE KEVIN HARRIS killed the person in charge of a sporting goods store during an armed robbery. He pleaded guilty to charges of first degree murder, armed robbery and a handgun violation. A judge on April 5, 1982 sentenced him to death. This Court vacated that death sentence in *Harris v. State*, 295 Md. 329, 455 A.2d 979 (1983). At a new sentencing hearing a jury determined death to be the appropriate penalty. We have remanded Harris' case for a determination concerning the entry of the plea of guilty to first degree murder. Nevertheless, under our mandate, the death sentence remains in effect, subject to the outcome of

the proceedings on remand. *See Harris v. State,* 299 Md. 511, 474 A.2d 890 (1984).

A jury in the Circuit Court for Harford County sentenced LAWRENCE JOHNSON to death for murder committed during a daytime housebreaking and robbery. Johnson committed the crimes with Dwayne T. Mayers, for which the latter received a life sentence, as noted above. Johnson's only mitigating factor in this conviction was that his act was not the sole cause of death. This sentence has not yet been reviewed by this Court. In a separate case in which the State sought the death penalty against Johnson, he received life for a murder-rape. *See Johnson v. State, supra,* 292 Md. 405, 439 A.2d 542 and the summary in *Stebbing v. State, supra,* 299 Md. at 378, 473 A.2d at 926–27.

From the foregoing review of "similar cases" in which the death penalty was sought and, as a consequence, trial judges filed reports with this Court, we conclude that, considering both the crime and the defendant, the sentence of death is not excessive or disproportionate. What we said in *Stebbing v. State, supra,* 299 Md. at 379, 473 A.2d at 927 also applies here.

In the [seven] cases of life sentences where verdict sheets were completed, the mitigating factors, articulated by the sentencing authorities and found in those cases to have outweighed the aggravating factor, reflect the channelized discretion which is the object of a modern death penalty statute and not the disparity that would annul the sentence in the case at bar.

The two robbery-murder cases which produced life sentences from jury deadlocks do not alter this result. *Id.* at 379–80, 473 A.2d at 927.

Appellant has also referred to other cases in which a life sentence was imposed. Many of these are not cases in which sentences were imposed under § 413 so that trial judge reports were not required under Rule 772A. We said in *Tichnell v. State,* 297 Md. 432, 465–466, 468 A.2d 1, 18

(1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984) (*Tichnell* III) that on § 414 reviews "the relevant inventory of cases [is] only those in which the death penalty was sought," with the exception that "we do not preclude any defendant whose death sentence is under appellate review from presenting argument, *with relevant facts,* that designated non-capital murder cases are similar ...." (Emphasis added.) Here White has not presented the facts which, in his view, make these non-capital cases relevant. He simply argues in a conclusory fashion that they are cases of "seriously aggravated premeditated murder and contract murder" or are felony murders where "the facts are more egregious than" those in his case. This is considerably short of the factual presentation needed to include one or more non-capital cases in the inventory of "similar cases."

We further find from our § 414 review that

(1) the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) the evidence supports the finding of attempted robbery as the aggravating factor; and

(3) the evidence supports the jury's finding that the aggravating circumstance is not outweighed by mitigating circumstances.

With respect to this third finding we note that the sentencing jury had no psychiatric evidence before it. The total record on appeal reflects that five psychiatrists who examined White at Clifton T. Perkins Hospital Center were unanimous in finding that he was competent, responsible and an anti-social personality. Defense counsel also had White examined by another psychiatrist, but counsel concluded that it was not in White's best interest to have this expert testify.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED, WITH COSTS.

COLE, Judge, dissenting.

Today, the majority sends a loud and poignant signal of a thousand decibels to the criminal defense bar: that challenges to jurors for cause made during voir dire examination go for naught and are not preserved unless particularized and restated prior to the jury being sworn. Indeed, even if the court on its own recognizes that objections for cause have been made and ruled upon, such objections are nevertheless waived and of no effect, if counsel, with no peremptory challenges remaining, indicates that he will proceed to trial with the jury then in the box. What I find more alarming, however, is that the majority in this case holds that the defendant waived his voir dire objections by *accepting* the jury, when the record clearly reveals that he never indicated that the jury that was sworn was acceptable to him. I, therefore, respectfully dissent.

It is unnecessary to relate the facts which gave rise to the charges against the defendant in this case, because the point I address could arise in any case, irrespective of the alleged misconduct, where the defendant seeks to select a fair and impartial jury to determine his fate. I shall, however, relate certain principles to help clarify my position.

A challenge for cause in a voir dire proceeding is the first step in securing an impartial jury. The granting of such a challenge represents a finding that a particular juror is biased or otherwise unable to fulfill his function as an impartial trier of fact. As this Court recognized over a century ago in *Waters v. State*, 51 Md. 430, 436 (1879):

> It is a fundamental principle underlying the trial by jury, that each juror shall so far as it is possible be entirely impartial and unbiased, in order that he may hear the evidence, and decide the matter in controversy uninfluenced by any extraneous considerations whatever.

Discovering bias or partiality in a particular juror is a difficult, often subjective task. Accordingly, this Court has consigned the conduct of voir dire largely to the discretion

of the trial court. *Connor v. State,* 225 Md. 543, 171 A.2d 699 (1961); *Brown v. State,* 220 Md. 29, 150 A.2d 895 (1959).[1] Nevertheless, several areas of that discretion have been supplanted by principles of law established by this Court. Although the trial judge is the principal interrogator during voir dire, the parties have a right to have proper questions propounded to the jury venire, and a failure by the trial court either to propound such questions or to allow counsel to propound such questions is an abuse of discretion. *Casey v. Roman Catholic Archbishop,* 217 Md. 595, 143 A.2d 627 (1958). The questions cannot be in a form so general that they do not indicate to the panel the nature of the bias being probed. *Id.* Moreover, the trial judge must tailor the questioning to the circumstances of each case to ensure that any biases peculiar to that case are exposed. *Bryant v. State,* 207 Md. 565, 115 A.2d 502 (1955).

For example, if the circumstances surrounding the case give rise to a potential racial bias and the defendant seeks to question the veniremen along those lines, the failure of the trial court to elicit such information is an abuse of discretion. *Brown v. State,* 220 Md. 29, 150 A.2d 895 (1959). This Court also has stated that it is error to fail to exclude a prospective juror who had incurred a loss because of allegedly illegal business practices by the defendant, and to fail to ask questions designed to reveal whether a juror has a pecuniary interest in the outcome of the litigation. *Lockhart v. State,* 145 Md. 602, 125 A. 829 (1924); *Alexander v. Grier & Sons Co.,* 181 Md. 415, 30 A.2d 757 (1943).

More recently, and more particularly for the purposes of this case, in *Langley v. State,* 281 Md. 337, 378 A.2d 1338

---

1. Maryland Rule 752 states:
   Rule 752. Voir Dire.
   The court may permit the parties to conduct an examination of prospective jurors or may itself conduct the examination. If the court conducts the examination, it shall permit the parties to supplement the examination by any further inquiry it deems proper or shall itself submit to the prospective jurors the additional questions proposed by the parties it deems proper.

(1977), this Court crafted another principle to guide the trial court's discretion in conducting voir dire. The defendant in *Langley* was on trial for the robbery of a taxicab driver; the State's principal evidence was the testimony of the victim and the arresting officer. The trial judge refused to ask prospective jurors whether any of them would give "more credit" to the testimony of a police officer than they would give to other witnesses, simply because of his status as a police officer. This Court reversed, holding that "where a principal part of the State's evidence is testimony of a police officer diametrically opposed to that of the defendant, it is prejudicial error to fail to propound a question such as that requested in this case." *Id.* at 349, 378 A.2d at 1344. The Court's rationale was straightforward:

A juror who states on voir dire that he would give more credit to the testimony of police officers than to other persons has prejudged an issue of credibility in the case. Regardless of his efforts to be impartial, a part of his method for resolving controverted issues will be to give greater weight to the version of the prosecution, largely because of the official status of the witness. The argument by the State that police officers are entitled to greater credibility because they have less interest in the outcome of the case is not sufficient to overcome such an objection.

*Id.* at 348, 378 A.2d at 1344.

This is not a case in which the trial court failed to propound counsel's requested question about juror bias toward police testimony—Cardarelli generated the issue himself by volunteering that he had such a bias. Because police testimony was a part of the State's proof, Cardarelli's statement was relevant to his fitness to serve on the jury. Once this bias had surfaced, it was incumbent upon the trial judge to explore the nature of the bias, and, if it subsisted, to dismiss the juror for cause. As we concluded in *Langley*, a juror with this type of prejudice "has prejudged an

issue of credibility in the case." *Id.* at 348, 378 A.2d at 1344.

The State argued in its brief that Cardarelli's bias was cured by his answers to the subsequent questions by the trial judge and the State's Attorney. My reading of the record, however, indicates that this effort at rehabilitation did not purge Cardarelli of his avowed inclination to give more weight to police testimony. The majority does not pursue the State's argument but assumes, *arguendo*, that even if Cardarelli should have been struck for cause, its conclusion would be unchanged because defense counsel waived this challenge.

Nor does the majority seriously contend that there was no prejudice to the defendant because he was forced to use one of his twenty peremptory strikes to keep Cardarelli from serving on the jury—as well it should not. The law is clear that the right to exercise peremptory challenges is very different from, and a complement to, the right to challenge a venireman for cause. If a defendant must exercise a peremptory challenge to strike a venireman when a challenge for cause should have already removed that person from the jury array, and the defendant, as in this case, subsequently exhausts his peremptory challenges, the defendant has been deprived of the use of one discretionary challenge. Because this deprivation can be traced directly to the failure to strike the venireman for cause, the error is prejudicial and reversible, unless the trial court extended and the defendant accepted the means to cure the error in the court's prior ruling. *See, e.g., United States v. Nell,* 526 F.2d 1223 (5th Cir.1976); *People v. Culhane,* 33 N.Y.2d 90, 305 N.E.2d 469, 350 N.Y.S.2d 381 (1973).

This conclusion is in accord with this Court's decision in *Lockhart v. State,* 145 Md. 602, 125 A. 829 (1924). There the Court found that the trial court erred in refusing to strike a juror for cause. The Court held, however, that the error was not reversible because the trial judge had allotted

to the defendant more peremptory strikes than he was entitled to under the existing law. Thus, there had been "no impairment of the defendant's right to be tried by a properly qualified jury." The Court, nonetheless, was unequivocal on the basic principle:

> If the statutory limitation as to the number of peremptory challenges had been duly applied in the selection of the jury, a ruling which rejected a valid challenge for cause, and thus required the employment of a peremptory challenge to dismiss the objectionable talesman, would be reversible error because of its practical reduction to that extent of the number of such challenges which the defendants were legally entitled to use in the exercise of their own discretion. *Id.* at 619, 125 A. at 834.

The *Lockhart* Court buttressed this point by citing *Stroud v. United States,* 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919), *reh. denied,* 251 U.S. 380, 40 S.Ct. 176, 64 L.Ed. 317 (1920), where the defendant was allowed and used twenty-one peremptory challenges, when he was entitled to only twenty, and one of those challenges was used against a juror as to whom a challenge for cause was improperly overruled. The Supreme Court held the defendant's rights had not been abridged.

In this case, the trial court offered the defendant no means to restore the peremptory challenge lost when he was forced to strike Cardarelli, who was incompetent to sit as a juror. Thus, the prejudice to the defendant remained unabated. Despite this circumstance, the majority maintains that it avails the defendant nothing because he waived the objection by stating that the jury was acceptable. The majority distorts the facts.

Although defense counsel did state "Jury Panel acceptable as constituted", he was not referring to the jury that decided the defendant's case. When defense counsel made this remark there were twelve prospective jurors in the box and two alternates, all of whom defense counsel approved.

But the State then challenged jurors No. 6 [2] and No. 3 and two other jurors took their places. The State further changed the prospective jury by challenging alternate No. 2. Obviously, at this point in the proceedings the jury which had been acceptable to the defense was no longer the jury in the box. The State, at this point, indicated that this jury was acceptable, but defense counsel was never asked if this jury was acceptable and never indicated his approval. Therefore, even if "acceptable" and "satisfied" are magic words creating waiver, they were never spoken by defense counsel pertaining to this jury.

After the Assistant State's Attorney accepted the jury, he requested to approach the bench, whereupon the trial judge proceeded to resolve certain pending matters before beginning the actual trial, as evidenced by the following colloquy:

MR. LEVITZ: ....

Members of the jury panel presently constituted is acceptable to the State.

THE COURT: Thank you, Mr. Levitz. Mr. Kaplan.

\* \* \* \* \* \*

MR. LEVITZ: May we approach the bench on another matter?

(Conference at Bench with the Defendant present)

THE COURT: Mr. Kaplan, you advised the Court at a time before the jury was sworn you would like to withdraw your plea of not guilty by reason of insanity.

MR. KAPLAN: That's right.

THE COURT: I think I ruled on it, but if not—

MR. KAPLAN: Yes, you did.

THE COURT: I now rule that the death penalty statute is constitutional in the State of Maryland. You have

---

2. After the State challenged Juror No. 6, defense counsel challenged the next talesman, Lester Stufft, with his twentieth peremptory. This plainly indicates that the jury became unacceptable to defense counsel when Juror No. 6 was struck. And, because he exhausted his peremptory challenges before the jury selection process was completed, his ability to remedy any defects was handicapped.

made that point for the record. You have your ruling on it.

MR. KAPLAN: I have informed you of the reason I filed the motion, Your Honor.

THE COURT: Sometime ago, for the record, Mr. White filed a plea of not guilty by reason of insanity. Do you understand?

DERRICK QUINTON WHITE: Yes, sir.

THE COURT: He now says that after discussions with you he wishes to withdraw that plea so that he doesn't now claim that you are legally insane at the time of the commission of this crime. Do you understand that?

MR. WHITE: Yes, sir.

THE COURT: All right.

MR. KAPLAN: Just for the record, I think I should state in view of the opinion of the Perkins staff we have no choice but to withdraw our plea, therefore, we are withdrawing our plea.

MR. LEVITZ: Is the Court going to appoint a foreman of the jury as the rules apply?

THE COURT: I am a little concerned about that, yes. I'd like to have somebody with a little bit more education. I propose to appoint Mrs. Herman, who is the registered nurse.

MR. KAPLAN: All right.

MR. LEVITZ: I don't have any objection.

THE COURT: Let me look at the panel, again. This is the kind of thing that gets judges in a little bit of trouble, but it's up to me to designate a foreman. I am going to appoint Mr. Cohen as foreman. I appoint Mr. Cohen solely because in my judgment based on his occupational experience he would be more adverse in handling this type of critical situation. That is discretionary on my part, and it's not meant to do anything that expresses my best judgment, so if you will trade seats with number one.

Mr. Kaplan, do you have any objection you wish to register, you have made an objection when the Court has excused or failed to excuse a juror for cause. That's already on the record. Do you have any objection to the proceeding by which this jury was empaneled. I tried to honor everybody's wishes.

MR. KAPLAN: No, I have no objection to any of that. My only objection would be that I felt Harris should have been called, if you insist she be struck for cause.

THE COURT: The record clearly indicates that Vanessea Harris was challenged for cause. It was done over your objection.

MR. KAPLAN: Yes, Your Honor.

THE COURT: All right. Swear the jury.

(Whereupon the jury was duly sworn).

The majority in summarily disposing of this issue says:

In the case at bar the defense expressly accepted the panel when it included ten of the twelve jurors who actually served. After White's peremptories were[1] exhausted, the membership of the panel changed by two. After those two persons were seated and before the jury was sworn, the court invited objections to the proceeding by which the jury was impaneled. Defense counsel told the court he had none. He further told the court that his "only objection" related to the *exclusion* of a prospective juror for cause, even though the court had pointed out that objections to excusing or failing to excuse a juror were already on the record, and, in effect, need not be repeated. Counsel's voluntary limitation on objections made to jury selection, coupled with his having shortly before pronounced as acceptable the jury as then constituted, demonstrate the defense's continued satisfaction with the panel and acceptance of the jury that served. Therefore, any error in denial of the challenge for cause was waived. The substance of the statements and their effect in this case are the same as in *Calhoun v. State, supra.* (emphasis in original).

The majority readily concedes that the jury defense counsel found acceptable was different from the jury finally selected. Then, the majority says that defense counsel, in reply to the court's inquiry as to whether he had any objections to the proceeding by which the jury was impaneled, told the court "he had none." Of course, this is not what counsel said. Defense counsel said "No, I have no objection to any of that"—"that" referring to the procedures used during the voir dire examination. Defense counsel then said: "My only objection would be that I felt Harris should have been called, if you insist she be struck for cause." The majority states this was a voluntary limitation on counsel's previous objections to the jury selection. This conclusion is a convenient interpretation of the record bordering on absurdity.

The majority agrees that the trial court "had pointed out that objections to excusing or failing to excuse a juror were already on the record, and, in effect, need not be repeated." The majority fails, however, to credit defense counsel with fully understanding what the court meant and responding accordingly. Defense counsel had ample reason for raising the Harris matter again. During in-chambers voir dire, the trial judge struck Harris for cause over defense counsel's objection. Nevertheless, Harris appeared in court as a part of the qualified pool from which the ultimate jury was to be selected. Defense counsel again inquired about her eligibility. The trial judge again excused Harris from the array. Thus, defense counsel had justifiable reason to raise the issue again to ensure that the record was clear. This was no "voluntary limitation" on any other objection defense counsel had made.

Furthermore, it is clear to me that in light of the majority's concession, not to mention plain common sense, the trial court's remarks were intended to ask the question: "I have noted your other objections which are on the record, is there any additional objection you have to the manner in which the jury was impaneled?" Defense counsel's response was to emphasize the fact that the trial court had

disqualified Harris on two occasions even though he felt her qualified. Defense counsel's remarks were responsive to the court's inquiry; they did not constitute an abandonment of what the trial judge indicated was preserved on the record.

In my view, the majority's holding makes a mockery or a game of the jury selection procedure. In order for an objection to a ruling on a challenge for cause to be preserved, counsel will have to repeat his objections at the end of the process or move that the jury be quashed or discharged before being sworn. This is contrary to what I believe the bar of Maryland understands and what our case law requires.[3] This is not a case like *Glover, Robinson & Gilmore v. State,* 273 Md. 448, 330 A.2d 201 (1975), where defense counsel, after objecting to the trial court's failure to follow the statutory procedure for selecting talesman, expressly abandoned his objection by having his clients state *unequivocally* on the record their satisfaction with the jury. Nor is this case like *Neusbaum v. State,* 156 Md. 149, 143 A. 872 (1928), where the trial court, after being informed that a prejudicial remark had been made in front of the entire jury array, offered counsel the opportunity to start over with an entirely new panel. In each of these cases both counsel and the court understood that the objection was being abandoned.

Here, however, the transcript demonstrates that neither the court nor counsel had any idea that counsel's remarks at the bench would vitiate all objections made in the extensive in-chambers voir dire. It is more reasonable to conclude that counsel was following *Tisdale v. State,* 30 Md. App. 334, 353 A.2d 653 (1976), which squarely held that "counsel's response—that the jury ultimately selected was

---

**3.** Under the common practice in many courts in this State, the judge or the clerk at the end of voir dire routinely asks counsel whether the jury is acceptable. Now, however, the majority holds that an affirmative answer to that *pro forma* question constitutes an abandonment of any prior challenges for cause unless those challenges are reaffirmed on the record.

'acceptable'—was merely obedient to the court's rulings and obviously not a withdrawal of the request, timely made, that the jurors be excused for cause." *Id.* at 340, 353 A.2d at 657.

The majority cites *Calhoun v. State*, 297 Md. 563, 468 A.2d 45 (1983), as being dispositive. *Calhoun*, however, is inapposite because the magic words "I accept" or "I am satisfied" were never uttered. In any event, to the extent that *Calhoun's* "short answer" may be considered as controlling, I depart from its holding. Not only does the short answer in *Calhoun* fail to justify its result with any reasoned analysis, its conclusion simply does not follow from the holdings in cases such as *Glover* and *Neusbaum*, where the record plainly indicated an unequivocal abandonment of a previous objection. I believe that justice requires this case to be remanded for a new trial. I, therefore, respectfully dissent.

I am authorized to state that Judge DAVIDSON concurs in the views here expressed.